ABRAHAM A. SALKOV AND EDITH H. SALKOV, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5892–64. Filed May 6, 1966.

*Herbert S. Garten* and *Sheldon G. Dagurt*, for the petitioners.
*David T. Link*, for the respondent.

DAWSON, *Judge:* Respondent determined the following deficiencies in the income taxes of petitioners:

| Year | Deficiency |
| --- | --- |
| 1960 | $507. 81 |
| 1961 | 574. 23 |

The only issue for decision is whether Abraham A. Salkov, a full-time cantor of the Jewish faith who was commissioned by the Cantors Assembly of America and installed by a congregation, is a "minister of the gospel" entitled to exclude certain amounts received as a rental allowance from his gross income under the provisions of section 107 (2) of the Internal Revenue Code of 1954.

FINDINGS OF FACT

Some of the facts were stipulated and are so found.

Abraham A. Salkov and Edith H. Salkov are husband and wife who reside at 2601 Manhattan Avenue, Baltimore, Md. They filed their joint Federal income tax returns for the calendar years 1960 and 1961 with the district directors of internal revenue at Los Angeles, Calif., and Baltimore, Md., respectively.

Abraham A. Salkov (hereinafter called petitioner) is a cantor in the Jewish faith. He was employed as a cantor on a full-time basis by the Temple Beth Am in Los Angeles from January 1960 through June 1961. Since July 1961 he has served as cantor for the Chizuk Amuno Congregation in Baltimore. During the year 1960 the petitioner received $2,400 from the Temple Beth Am as a dwelling rental allowance. During the year 1961 he received as a dwelling rental allowance $1,300 from the Temple Beth Am and $1,250 from the

Chizuk Amuno Congregation. The entire amounts so received were used to pay the expenses of providing a home for the petitioner and his family in 1960 and 1961.

As a cantor the principal activity of the petitioner revolves around his duties in the conduct of the Jewish liturgy. He officiates, along with the rabbi, at the following public worship rituals: the major Jewish festivals,[1] "high holidays,"[2] weddings, funerals, and the regular weekly Sabbath services conducted each Friday evening and Saturday morning. As their schedules required, either the petitioner or the rabbi, or both, officiated at morning and evening services held in the homes of deceased members of the congregation, called houses of mourning. The petitioner was solely responsible for the training of the boys in his congregation for their introduction into adult Jewish life.[3] In addition, the petitioner controlled the entire musical program of the congregation by providing the desired liturgical approach for the choral director [4] and directly supervised the work of the youth chorus.

Petitioner began his training for the cantorate under the direction of his father, who was also a cantor. From him the petitioner learned the free improvisational style used by a cantor in much of his liturgical work. He acquired his more formal choral music training at Yeshiva University, where he also studied Talmudic law and Jewish prayer.

After completing his formal training and securing his father's opinion that he was ready to enter the cantorate, the petitioner was accepted into the Cantors Assembly of America [5] and was granted the following commission:

### THE CANTORS ASSEMBLY OF AMERICA

. To all persons to whom these presents may come and to all congregations of the Jewish Faith

GREETINGS;

Be it known that

REVEREND ABRAHAM SALKOV

having duly completed the studies and satisfied the requirements for entry into the Hazzan Ministry known as the Cantorate, and having met the personal and religious standards and qualifications required by the Cantors Assembly of

---

[1] Comprised of Pesach (Passover) in the spring, Shavuos (Pentecost) in early summer, and Succos (Tabernacles) in the fall.

[2] Called Rosh Hashana (New Year) and Yom Kippur (Day of Atonement).

[3] This rite, called bar mitzvah, occurs when the Jewish male nears the age of 13.

[4] Chizuk Amuno has several choirs or choruses. A professional one is used for the services held during the festivals and high holidays as well as each Friday evening, a professional and volunteer choral society presents concerts and a youth chorus is maintained. The choral director, Saul Lilienstein, has the title of director of sacred music.

[5] There are three major branches of Judaism—Orthodox, Conservative, and Reform. The Cantors Assembly of America is attached to the United Synagogue of America, the parent organization of the Conservative synagogues in the United States.

America and the Jewish Faith for a Hazzan-Minister is hereby duly commissioned as a Cantor Hazzan-Minister with full authority to exercise his ministry in the conduct of religious services and in the performance of the sacerdotal rites of Judaism, and is hereby given all the rights, privileges and immunities appertaining to that of a

HAZZAN-MINISTER OF THE JEWISH FAITH.

"Our God and God of our Fathers inspire the lips of those who have been designated by Thy people, the House of Israel, to stand in prayer before Thee, to beseech and supplicate Thy Presence for them."

IN WITNESS WHEREOF and by virtue of the authority granted the Cantors Assembly of America by a Charter of the State of New York, we have caused this commission to be signed by the signatories of the Charter and our corporate seal to be affixed as of
    the 23rd day of June, 1947, corresponding to
    the 5th day of Tamuz, 5707.

At Chizuk Amuno the selection of the congregation's spiritual leadership is controlled by the Ritual Committee with the final approval of the board of trustees. When Chizuk Amuno decided it needed another cantor [6] in the spring of 1961, the Ritual Committee contacted the Placement Committee of the Cantors Assembly of America. The committee then processed the candidates recommended by the assembly through investigation and interviews in order to determine their qualifications. The committee unanimously recommended the petitioner to the board and it unanimously approved the recommendation. The word used to characterize this process of selection (and the notification of the spiritual leader involved) is "calling." After accepting the "calling" of Chizuk Amuno, the petitioner was formally installed in his position as cantor during a regular Friday night service in which the rabbi of Chizuk Amuno "charged" the petitioner with the duties and spiritual responsibilities of his office. Each congregation has jurisdiction over the methods by which it installs its cantors and rabbis. At Chizuk Amuno the installation procedures for both are the same.

The Jewish religion is a lay religion. It has no theologically required hierarchy having control, dominion, or jurisdiction over its sacerdotal functions or religious worship. The single element of authority present in Judaism is completely juridical. It resides in the members of the rabbinate who alone may issue binding interpretations of Jewish law.

Within the synagogue there are equal pulpits for the rabbi and the cantor. Both of them wear dark ecclesiastical robes (except on certain holidays when white robes are worn) which distinguish them from the

---

[6] The Chizuk Amuno congregation has two places of worship, one in downtown Baltimore and the other in a residential area of the city. The congregation's senior cantor, Hazzan Weisgal, serves the former and petitioner the latter.

rest of the congregation. In point of time the cantor is more in the pulpit of the synagogue than the rabbi. Inscribed upon the cantor's pulpit, in Hebrew, are the words, "Sing unto him—Sing praises unto him, exult him, speak of all his wonders," which refer to the cantor in his praise of the Lord.

The purpose of a cantor while he is officiating at services is to try to express the longings of the congregation and their prayers before their Father in heaven rather than proving virtuosity as a singer or artist. In order to be a cantor an extensive knowledge of Jewish law and tradition is required.

The bulletin published by Chizuk Amuno regularly carries an announcement on the availability of its cantors and rabbis for pastoral duties. An example of an announcement carried in the bulletin is as follows:

> The Rabbis and Cantors of the Congregation are available to the members and their families for any service which they may be in a position to render.
>
> While their calendars are sometimes filled for weeks and even months in advance, they always recognize that their first duty is to the Congregation. They visit the sick at home or in the hospital, when notified by a member of a family. They are available for counseling at hours which may be arranged by a telephone call.

The petitioner has an office in the Chizuk Amuno Synagogue for his use. He is listed in the yellow pages of the Baltimore telephone directory under the title "Clergyman" as "Salkov, Abraham, Reverend."

In his notice of deficiency dated September 28, 1964, the respondent determined that the dwelling rental allowances paid to petitioner in 1960 and 1961 are "not exempt from income tax" but are "taxable as ordinary income."

### OPINION

To our knowledge there are no cases which have decided the precise issue before us in this proceeding.[7] We are thus faced squarely with a question of first impression.

---

[7] The Commissioner, however, has issued several revenue rulings pertaining to sec. 107. One deals specifically with a cantor. It is Rev. Rul. 61–213, 1961–2 C.B. 27, which states that an individual who performs the duties of a cantor at a Jewish community center is not entitled to exclude his rental allowance from gross income where he is not an *ordained* minister of the gospel. But compare Rev. Rul. 58–221, 1958–1 C.B. 53, which allows the exclusion to an individual at a community center and temple who conducts services and performs sacerdotal functions according to the tenets of the Jewish faith where he is *ordained* and performs the duties ordinarily performed by a rabbi. See also I.T. 3658, 1944 C.B. 71 (involving a theological seminary teacher) ; Rev. Rul. 63–90, 1963–1 C.B. 27 (involving teachers and administrators of religious bodies) ; Rev. Rul. 64–326, 1964–2 C.B. 37 (involving a traveling evangelist) ; Rev. Rul. 65–124, 1965–1 C.B. 60 (involving unordained workers for religious organizations) ; and Rev. Rul. 66–90, 1966–1 C.B. 27 (holding that individuals in executive positions in a religious denomination, which has no formal ordination, commissioning or licensing procedure, do not qualify as ministers of the gospel under sec. 107.).

Section 107(2), Internal Revenue Code of 1954, provides that, in the case of a minister of the gospel, gross income does not include the rental allowance paid to him as part of his compensation to the extent used by him to rent or provide a home. Respondent admits that the Temple Beth Am and the Chizuk Amuno Congregation designated the amounts received by the petitioner as rental allowances and that he used them to provide a home for himself and his family. Cf. *Richard R. Eden*, 41 T.C. 605 (1964). Consequently, the respondent's narrow contention here is that the petitioner is not a "minister of the gospel" within the intendment of the statute. Petitioner, of course, takes the opposite view.

By definition a "minister" is one who is authorized to administer the sacraments, preach, and conduct services of worship. And "gospel" means glad tidings or a message, teaching, doctrine, or course of action having certain efficacy or validity. "Gospel," when used with a capital G, generally means the teachings of the Christian church as originally preached by Jesus Christ and his apostles or a narrative of Christ's life and teachings as exemplified by any of the first four books of the New Testament. Although "minister of the gospel" is phrased in Christian terms, we are satisfied that Congress did not intend to exclude those persons who are the equivalent of "ministers" in other religions. Nomenclature alone is not determinative.

Unfortunately the legislative history of the statute is brief and not helpful. Paragraph (2) of section 107 appeared first in the Internal Revenue Code of 1954 to clarify the discrepancy between rental allowances paid by congregations and residences actually furnished by them.[8] Paragraph (1) of section 107 originated as section 213(b)(11)[9] of the Revenue Act of 1921 without any explanation of the phrase "minister of the gospel." It has remained unchanged and unexplained[10] ever since.

---

[8] H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 15 (1954); S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 16 (1954).

[9] Sec. 213. That for the purpose of this title * * * the term "gross income"—

\*      \*      \*      \*      \*      \*      \*

(b) Does not include the following items, * * *

\*      \*      \*      \*      \*      \*      \*

(11) The rental value of a dwelling house and appurtenances thereof furnished to a minister of the gospel as part of his compensation;

[10] Only one reference has been made to this phrase since its appearance in the 1921 Revenue Act. During hearings on the Revenue Act of 1934 it was suggested that the word "gospel" be changed to "religion." The discussion was brief and no action was taken. See Confidential Hearings of the Senate Finance Committee on the Revenue Act of 1934, pp. 30–31.

The pertinent provisions of the Income Tax Regulations are set forth below.[11]  In short, section 1.1402(c)–5(b)(2) of the regulations mentions three types of services which are considered ministerial: (1) The ministration of sacerdotal functions, (2) the conduct of religious worship, and (3) the direction of organizations within the church. The regulations do not attempt to say what a "minister" is, but only what a "minister" does.

This record abounds with proof that the petitioner spent his full time performing services of all three types.  His responsibilities in officiating at weddings, funerals, and at houses of mourning clearly fall within the phrase "sacerdotal functions" as applied to the liturgical practices of the Jewish faith.  Both the petitioner and Rabbi Goldman with whom he serves testified at length as to the manner in which they jointly conducted the weekly religious ceremonies,

---

[11] Sec. 1.107–1. Rental value of parsonages.

(a) In the case of a minister of the gospel, gross income does not include (1) the rental value of a home, including utilities, furnished to him as a part of his compensation, or (2) the rental allowance paid to him as part of his compensation to the extent such allowance is used by him to rent or otherwise provide a home.  In order to qualify for the exclusion, the home or rental allowance must be provided as remuneration for services which are ordinarily the duties of a minister of the gospel.  In general, the rules provided in § 1.1402(c)–5 will be applicable to such determination.  Examples of specific services the performance of which will be considered duties of a minister for purposes of section 107 include the performance of sacerdotal functions, the conduct of religious worship, the administration and maintenance of religious organizations and their integral agencies, and the performance of teaching and administrative duties at theological seminaries. * * *

Sec. 1.1402(c)–5. Ministers and members of religious orders.

(a) *In general.* For taxable years ending before 1955, a duly ordained, commissioned, or licensed minister of a church or a member of a religious order is not engaged in carrying on a trade or business with respect to service performed by him in the exercise of his ministry or in the exercise of duties required by such order. * * *

* * * * * * *

(2) Except as provided in paragraph (c)(3) of this section, service performed by a minister in the exercise of his ministry includes the ministration of sacerdotal functions and the conduct of religious worship, and the control, conduct, and maintenance of religious organizations (including the religious boards, societies, and other integral agencies of such organizations), under the authority of a religious body constituting a church or church denomination.  The following rules are applicable in determining whether services performed by a minister are performed in the exercise of his ministry :

(i) Whether service performed by a minister constitutes the conduct of religious worship or the ministration of sacerdotal functions depends on the tenets and practices of the particular religious body constituting his church or church denomination.

(ii) Service performed by a minister in the control, conduct, and maintenance of a religious organization relates to directing, managing, or promoting the activities of such organization.  Any religious organization is deemed to be under the authority of a religious body constituting a church or church denomination if it is organized and dedicated to carrying out the tenets and principles of a faith in accordance with either the requirements or sanctions governing the creation of institutions of the faith.  The term "religious organization" has the same meaning and application as is given to the term for income tax purposes.

(iii) If a minister is performing service in the conduct of religious worship or the ministration of sacerdotal functions, such service is in the exercise of his ministry whether or not it is performed for a religious organization. * * *

festivals, and high holidays. And, finally, the petitioner's training of the young men of his congregation, his overall direction of its musical program, and the supervision of the youth chorus fall into the last category.

Another requirement of the regulations is that only "a duly ordained, commissioned, or licensed minister of a church or a member of a religious order" can qualify for the statutory exclusion of section 107. It is reasonably clear that the purpose of this reference in the regulations is to exclude self-appointed ministers. Certainly the minister must be ordained, commissioned, or licensed. But there is in the regulations no test, or even a suggestion of it, that the ordination, commissioning, or licensing must come from some higher ecclesiastical authority. In a religious discipline having the lay democratic character of Judaism and lacking any central ecclesiastical organization, this ministerial authority can be conferred by the church or congregation itself. If the statute and the regulations were so severely restrictive as to exclude ministers elected, designated, or appointed by a religious congregation, there would be a serious question in our minds as to propriety of such an exclusion under the Constitution of the United States.

Respondent maintains that Cantor Salkov is not a "minister of the gospel" because he does not perform the one function reserved to the rabbi, the only *ordained* minister of the Jewish religion, namely, deciding questions of Jewish law. Consequently, the respondent presses the point that the rabbi, and not the cantor, is the *only* Jewish equivalent of a "minister." In a technical sense the petitioner is not an "ordained" minister. He does not claim that he, like the rabbi, has the right to judge, decide, and authoritatively teach Jewish law. Ordination has a restricted meaning in the Jewish faith. It is simply the testimony of a recognized religious authority that the rabbi *ordained* is worthy of being invested with the mantle of *Jewish legal authority*. A cantor does not have the authority to sit on any Jewish court dealing with problems of divorce or real estate. Even though the rabbinate possesses the sole authority over Jewish law, we fail to see what difference this makes in determining whether the cantor is a minister. Authoritative interpretation of religious law is not a primary, much less essential, element of the ministry. Rabbis have long been regarded as ministers, not because they interpret Jewish law but because they perform for their congregations the same sacerdotal functions that are performed by their equivalents in non-Jewish religions. The fact that Judaism assigns this work

to two classes of professionally trained and qualified men will not be used by this Court to deny the benefits of section 107 to one (the cantor) merely because other religions have merged such duties into a single group.

Respondent stresses that "duly ordained, commissioned or licensed" is a conjunctive phrase. We disagree. The words are stated in the disjunctive. The regulation does not say only "ordained." It also says "commissioned or licensed." "Commission" means the act of committing to the charge of another or an entrusting; and "license" means an official document giving permission to engage in a specified activity. We have no doubt that the petitioner meets these requirements. He is a duly qualified member of the Cantors Assembly of America and he holds a commission as a cantor from that body. The assembly functions as the official cantorial body for the conservative branch of the Jewish religion in this country. Chizuk Amuno is a representative conservative congregation. Since each congregation is autonomous in its selection of spiritual leaders, the members of Chizuk Amuno, acting through their representatives on the Ritual Committee and the board of trustees, singled out the petitioner as their choice for the cantorate of the congregation and formally installed him in that position. Every possible procedure consonant with the sacred traditions of Judaism was employed to express in a formal and liturgical manner that the petitioner had been chosen by the Chizuk Amuno congregation as cantor and that he assumed his duties on a certain day as evidenced by a public and specific installation ceremony. To read into the phrase "duly ordained, commissioned or licensed" a requirement that the petitioner's authority to perform the sacred functions of Judaism is subject to any further commissioning or licensing would deny to members of the Jewish religion the right to structure the organization of their congregations according to the principles and tenets of their faith. Suffice it to say that in the Jewish religion the cantor is recognized as a minister *eo nomine*. As such, we are unwilling to fit on him the garments of Christian orthodoxy, for "if there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in * * * religion." *Board of Education* v. *Barnette*, 319 U.S. 624, 642 (1942) ; and see also *Pate* v. *United States*, 243 F. 2d 99 (C.A. 5, 1957).

The brief of the respondent indicates that the petitioner has no designation as a recognized religious and spiritual official in the Jewish

religion. This is not so.[12] Petitioner and persons with similar responsibilities are called by such titles as "Cantor," "Hazzan" or "Reverend." Surely these titles are not without meaning. Since ancient times the Cantor-Hazzan has been recognized in Judaism as a spiritual official. By tradition he is a sheliach tzibbur, viz, the emissary of the congregation before the Almighty in prayer. Indicia of his official recognition in a tangible way are his pulpit and his office in the synagogue.

Regardless of the theoretical power of a Jewish layman, what in fact does Cantor Salkov do and what are his functions? He is a spiritual leader. He teaches. He performs pastoral duties. He is the minister-messenger of the Chizuk Amuno Congregation, commissioned and licensed by the congregation and by the Cantors Assembly of America to officiate professionally and regularly in the sacred religious service of the Jewish people. His functions are beyond any "minister of music." He performs what is regarded as the sacerdotal functions of Judaism—the sanctification of the Sabbath and festival wine in the synagogue (compare the Christian Mass and Communion); he elevates and holds the sacred Torah (compare the elevation of the Host); and he waves the sacred Lulav (compare the waving of the palms). For long periods of both prayer and service he is the only person standing at the pulpit. At all times he and the rabbi share the pulpit. Historically and functionally he is a sui generis minister.

---

[12] See the "Guide to Congregational Standards" approved in 1952 by the United Synagogue of America, which is the national organization of the conservative synagogues in this country. Article 1 of the Guide reads, in part, as follows:

B. The Congregation and Its Rabbi

Section 1. General Principles

The relation between a Congregation and its Rabbi is that of a religious community and its chosen spiritual leader. It therefore extends beyond the stipulations of a legal agreement. Accordingly, in any contract between the Congregation and its Rabbi, and in the interpretation, performance and termination thereof, the following general principles shall be considered as part of said agreement and shall apply thereto, without express statement in the contract or reference thereto:

a. A Rabbi is not to be considered and should not consider himself as having the status merely of an employee of the Congregation, but is the spiritual leader of the Congregation, called to serve the religious, educational, spiritual and pastoral needs of its membership.

C. The Congregation and Its Cantor

The Cantor shall participate in all religious *rites* and services in the synagogue under the supervision of the Rabbi. * * *

\*   \*   \*   \*   \*   \*   \*

All public announcements of religious services shall include the name of the Cantor as well as the Rabbi.

\*   \*   \*   \*   \*   \*   \*

The provisions of this Guide under Article 1, subdivision B, entitled, "The Congregation and Its Rabbi," *are hereby made applicable to Cantors,* with the exception of the provision relating to attendance at meetings of the Board of Directors or Trustees of the Congregation. [Emphasis supplied.]

Hence, from the thicket of our factual and legal exploration of this issue, we emerge with the conclusion that in these particular circumstances the petitioner, a full-time cantor of the Jewish faith, qualifies as a "minister of the gospel" within the spirit, meaning and intendment of section 107. Accordingly, we hold that the respondent erred in his determination to the contrary.

Reviewed by the Court.

*Decision will be entered for the petitioners.*

---

TANNENWALD, *J.*, did not participate in the above decision for the reason that he is a member of the governing body of an institution which, among other things, operates a school to train cantors.