W. Astor Kirk and Vivian M. Kirk, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket No. 6333–66. Filed October 17, 1968.

W. Astor Kirk, pro se.
*Robert J. Curphy*, for the respondent.

#### OPINION

Tietjens, *Judge*: The Commissioner determined a deficiency in petitioners' Federal income tax for the taxable year 1964 in the amount of $765.56. The only issue presented is whether petitioners may exclude from gross income a rental allowance paid to petitioner, W. Astor Kirk, by the General Board of Christian Social Concerns of

the Methodist Church. The exclusion is claimed under section 107(2), I.R.C. 1954.[1]

The facts have been fully stipulated and the case submitted under Rule 30. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

W. Astor Kirk and Vivian M. Kirk are husband and wife. They resided in Washington, D.C., during their taxable year 1964 and filed a joint income tax return for that year with the district director of internal revenue, Baltimore, Md. They resided in Austin, Tex., at the time they filed their petition herein.

W. Astor Kirk, hereinafter referred to as petitioner, was not an ordained, commissioned, or licensed minister of the gospel in the taxable year 1964.

During 1964 petitioner was employed by the General Board of Christian Social Concerns of the Methodist Church (hereinafter sometimes referred to as the board). The board provides a housing allowance for each of its professional employees. Petitioner served on the board as director of the Department of Public Affairs in the board's Division of Human Relations and Economic Affairs. The services provided by petitioner were not different in character from those performed by 11 other professional employees of the board, 9 of whom were ordained ministers in the Methodist Church. These services were not sacerdotal in character, nor did they involve the conduct of religious worship.

The professional staff of the board is required by the *"Discipline"* [2] to promote, sponsor, and administer programs of social research, education, and action with respect to a broad range of social issues and problems, including the following:

Race relations.
Civil liberties.
Public policy on education.
Church and state relations.
American foreign policy.
United Nations and related international organizations.
Disarmament and nuclear weapons control.
Drug control.
Foreign aid.
Alcohol problems.
Juvenile delinquency.
Mental health.
Problems associated with aging, population, planned parenthood.
Penal system and rehabilitation of criminals.

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise noted.
[2] "Doctrines and Disciplines of the Methodist Church" set forth the organization, powers, duties. and responsibilities of the board.

68

As conceived by the professional staff of the board, the fundamental objectives of such programs of research, education, and action are twofold: *first*, to affect in some determinate way the formation and execution of social policy, both in its public and private aspects. The term "social policy" was defined as consisting of all community decisions and actions of public and private individuals and groups which authoritatively allocate community values and resources. *Second*, an effort was made through programs of research, education, and action to influence patterns and structures of social relations, both public and private, in some determinate way.

In promoting, sponsoring, and administering programs of research, education, and action, all of the required functions of the board's professional employees, including those of petitioner, may be subsumed under the following generic categories:

1. Finding of facts and gathering of data regarding social issues and problems.

2. Identification of social issues and problems that should receive the attention of churches, in their status as organized social groups in society.

3. Careful delineation of issues and problems.

4. Selection of appropriate courses of action (i.e., efforts to affect social policy and influence patterns and structures of social relations) from available alternatives.

5. Establishment of priorities, and allocation and expenditure of resources (human, material, and financial).

6. Systematic evaluation of results of efforts over a definite period of time.

7. Periodic reporting of program results to *members* of the Board, thus insuring staff responsibility and accountability.

8. Recommendations to Board members with respect to future policy and needed changes in existing policies.

In the performance of the functions cited above, all of the board's professional employees, including petitioner, promoted, sponsored, and conducted such specific activities as the following: Study conferences, workshops, seminars, and other similar-type meetings; giving lectures at institutions of higher education; writing articles for national publications; preparing bibliographical materials dealing with particular social issues and problems; supervising and engaging in applied social research projects; assisting communities to resolve controversial problems such as those related to racial, religious, and ethnic discrimination; and preparing documents, reports, and testimony for presentation to Federal, State, and local legislative and administrative bodies. None of the foregoing activities nor any other activities required of the board's professional staff involved rendering services of a sacerdotal character or the conduct of religious worship.

As director of the board's public affairs department, petitioner was assigned responsibility for promoting, sponsoring and administering programs of research, education, and action in the following social problem areas: Civil liberties and civil rights, church and State rela-

tions, public policy on education, housing and urban affairs, legislative reapportionment, and group participation in the political process.

As an employee of the board, petitioner received a rental allowance from the board in the amount of $2,624.97 in the tax year 1964, which sum was not reported as income by the petitioners in their 1964 joint income tax return, although petitioners did make a full disclosure of the fact that such sum was not reported. This rental allowance was designated as rental allowance by the board prior to payment, and constituted a part of the remuneration for the services rendered by the petitioner to the board. The petitioners used the entire rental allowance of $2,624.97 to rent or otherwise provide a home during 1964.

In his notice of deficiency, the Commissioner determined additional income in the amount of this allowance with the following explanation:

> It is determined that the $3,000 [3] considered by you in your income tax return as an excludible rental allowance qualifying under section 107 of the Internal Revenue Code of 1954 is not properly excludible from income since you are not a "minister" within the meaning of section 107. Neither section 107 nor any other section of the Internal Revenue Code of 1954 provides for an exclusion of the $3,000 received by you and excluded from income reported by you in your return. Since you excluded the $3,000 from gross income reported, gross income has been increased by $3,000.

Section 61 defines gross income as all income from whatever source derived, including (but not limited to) compensation for services. The rental allowance here was in the nature of compensation and must be included in gross income unless a provision of the Code specifically excludes it.

Section 107(2) provides that, in the case of a minister of the gospel, gross income does not include the rental allowance paid to him as part of his compensation, to the extent used by him to rent or provide a home. The board designated the $2,624.97 received by the petitioner as rental allowance. This amount was actually used by the petitioner to provide a home for himself and his family. Consequently, the Commissioner's narrow contention here is that the petitioner is not a "minister of the gospel" within the intendment of the statute.

As commonly understood, "minister of the gospel" refers to a person who is ordained, commissioned, or licensed with the authority to perform sacerdotal functions, including the administering of the sacraments, preaching, and conducting religious services of worship. And "gospel" means glad tidings or message, teaching, doctrine, or course of action having certain efficacy or validity. Paragraph (2) of section 107 appeared first in the Internal Revenue Code of 1954 to clarify the discrepancy between rental allowances paid by congregations and residences actually furnished by them. As to the latter case, paragraph

---

[3] The parties have now stipulated that the correct amount actually received by petitioner as rental allowance was $2,624.97.

(1) of section 107, originally section 213(b) (11) of the Revenue Act of 1921, had excluded from gross income the rental value of a dwelling house furnished to a minister of the gospel as part of his compensation.

Section 1.107–1, Income Tax Regs., provides that in order to qualify for the exclusion, the rental allowance must be provided as remuneration for services which are ordinarily the duties of a minister of the gospel. Section 1.1402(c)–5(b) (2), Income Tax Regs., provides that "service performed by a minister in the exercise of his ministry includes * * * the control, conduct, and maintenance of religious organizations (including the religious boards, societies, and other integral agencies of such organizations), under the authority of a religious body constituting a church or church denomination." More specifically, subdivision (ii) provides:

> Service performed by a minister in the control, conduct, and maintenance of a religious organization relates to directing, managing, or promoting the activities of such organization. Any religious organization is deemed to be under the authority of a religious body constituting a church or church denomination if it is organized and dedicated to carrying out the tenets and principles of a faith in accordance with either the requirements or sanctions governing the creation of institutions of the faith. The term "religious organization" has the same meaning and application as is given to the term for income tax purposes.

There can be no serious question that the petitioner in this case falls fairly within the bounds of the requirement of performing services which are ordinarily the duties of a minister. Indeed, 9 of the 11 persons performing these same services were in fact ordained ministers of the Methodist Church. The board clearly constitutes a religious organization which was formally dedicated to carrying out the tenets of the Methodist faith in accordance with the requirements or sanctions governing the creation of institutions of the faith. The "Doctrines and Disciplines of the Methodist Church" set forth the tenets of Methodism and clearly establish the Board of Christian Social Concerns as an institution dedicated to the spreading of the "gospel"—the glad tidings or message of Methodism:

### BOARD OF CHRISTIAN SOCIAL CONCERNS

Section I. Purpose and Names

¶1516. Through all of its history Methodism has sought to relate the gospel which it has preached to the life of its members and to the communities in which they have lived. It has sought to follow Christ in bringing the whole of life, with its activities, possessions, and relationships, into conformity with the will of God. To lift up before the members of the church and also the secular world the Christian concern for personal, social, and civic righteousness, to analyze the issues which confront the nation and the world as well as the local community and the person, and to propose Christian lines of action, there shall be a Board of Christian Social Concerns. The board shall be incorporated.

¶1517. Board members and executives of the board shall speak and act in the true freedom of forgiven men. Truth is possible when controversies, expected because of human differences, are conducted in Christian love. The board is expected to speak to the church its convictions, interpretations, and concerns. Recognizing the freedom of all Christian men, the board never presumes to speak for the whole church.

Granting that petitioner performed services that are ordinarily the duties of a minister of the gospel, another requirement of the regulations is that petitioner *be* a minister of the gospel. Specifically the regulations *require* him to be "a duly ordained, commissioned, or licensed minister of a church or a member of a religious order." We have recognized that the purpose of this reference in the regulations is to exclude self-appointed ministers. *Abraham A. Salkov*, 46 T.C. 190, 196 (1966). As we said in *Salkov*, certainly the minister must be ordained, commissioned, or licensed. As interpreted by this Court in *Salkov*, the words "duly ordained, commissioned or licensed" are stated in the disjunctive. The regulation does not say only "ordained." It also says "commissioned or licensed." "Commission" means the act of committing to the charge of another or an entrusting; and "license" means an official document giving permission to engage in a specified activity. *Abraham A. Salkov, supra* at 197. Petitioner is a member of a church which provides for the ordination of ministers. He does not claim to be ordained. Nor is he "licensed" in the sense that he has any official document or other indicia of permission, formally conferred upon him, to perform sacerdotal functions. We do not think he is "commissioned." No congregation or other body of believers was committed to his charge. The duty of spreading of the gospel, either by sermon or teaching, was not formally entrusted to his care. Petitioner here is merely a nonordained church employee. *Robert D. Lawrence*, 50 T.C. 494 (1968). Furthermore, all the services performed by petitioner in this case were of secular nature.

Perhaps the extended attention given above is unnecessary. We feel, however, that petitioner's obvious sincerity deserves some answer, even though his stipulation that he "was not an ordained, commissioned, or licensed minister of the gospel in tax year 1964" and "has no intention as of this date of becoming an ordained, commissioned, or licensed minister of the gospel in any religious denomination of whatever nature" is enough to deny him the claimed exclusion.

Petitioner argues further that he is entitled to the exclusion provided in section 107 in spite of the fact that he is not a "minister of the gospel."

If we understand him, petitioner argues that because the ordained employees of the board claimed exclusion of the rental allowance—considering themselves as performing duties of a minister in their

administration of a religious organization within the meaning of the quoted regulation—that it would be constitutionally impermissible for the Commissioner to discriminate against petitioner by denying him the same privilege *solely* on the ground that petitioner is not an ordained, commissioned, or licensed minister of the gospel.

To this effect, he contends that the Commissioner's regulations have created a class of employment—i.e., administration and maintenance of religious organizations including directing, managing, or promoting the activities of such organization; that it is with respect to that class of employment that the rental allowance is excludable; that petitioner is engaged in such employment (as are the nine ordained ministers whose exclusions apparently have not been challenged by the Commissioner), and that the exclusion is denied him *solely* because he is not a minister. This argument misconceives the function of section 107 and the regulations enacted thereunder.

The exclusion is not provided to a broad class of persons from which petitioner is excluded solely because he is not a minister. The exclusion is granted by legislative grace to *ministers of the gospel* alone. All persons who are not ministers are denied this grace, including the Commissioner of Internal Revenue and the Judges on this Court. The Commissioner has not unconstitutionally discriminated against the petitioner by denying him the benefit of an exclusion he has not shown himself entitled to.

Even so, argues petitioner, we should hold that section 107 violates the Constitution for the reason that it tends toward the establishment of religion. That is an interesting inquiry. We refuse to pursue it, however, because petitioner would not be entitled to the exclusion in any event.

*Decision will be entered under Rule 50.*