MARC H. TANENBAUM AND HELGA TANENBAUM, PETITIONERS *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4666-68. Filed April 4, 1972.

*Ira M. Langer* and *Philip Zimet*, for the petitioners.
*Kimball K. Ross*, for the respondent.

QUEALY, *Judge:* The respondent has determined deficiencies in the Federal income tax of the petitioners as follows:

| Year | Deficiency |
| --- | --- |
| 1962 | $1, 658. 31 |
| 1963 | 1, 813. 82 |
| 1964 | 1, 287. 29 |

Concessions and agreements having been made by the parties, the questions for decision are:

(1) During the years at issue, whether petitioner Marc H. Tanenbaum received a parsonage allowance as a "minister of the gospel" so as to be entitled to the exclusion from gross income provided for in section 107.[1]

(2) During the calendar years 1962 and 1963, whether the petitioners are entitled to a deduction in excess of the amounts claimed and deducted on their Federal income tax returns for such years as a result of expenditures incurred in purchasing professional publications.

(3) During the calendar year 1963, whether the petitioners are entitled to a deduction within the provisions of section 162 in the total amount of $446.17 due to expenditures incurred on certain trips made by petitioner Marc H. Tanenbaum.

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.

1

If we find for the petitioners on the first issue, then in each of the years in issue we must also determine the total amount of the expenditures excludable from gross income within the meaning of section 107 as expenses incurred in order to "rent or provide a home."

On the other hand, if we find for the respondent on the first issue, then in each of the years in issue we must also determine whether the amount deducted by the petitioners for expenses incurred in operating an office within the petitioners' apartment was proper. This determination, in turn, involves a determination as to the correct portion of the petitioners' apartment devoted to business office use.

In addition, if we decide for the respondent on the first issue, then we must also determine whether the amount deducted by the petitioner for telephone calls made by him in the ordinary course of his business was proper.

For each of the years at issue, the medical deduction allowable to the petitioners will be controlled by their adjusted gross income for those years, as determined by the decisions reached in this case.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Marc H. Tanenbaum and Helga Tanenbaum are husband and wife who filed joint income tax returns for the taxable years 1962, 1963, and 1964 with the district director of internal revenue, New York, N.Y. At the time of the filing of the petition herein, they resided in Jackson Heights, N.Y. Helga Tanenbaum is a party to this action solely by virtue of having filed a joint return; consequently, Marc H. Tanenbaum will hereinafter be referred to as the petitioner.

The petitioner is an ordained rabbi of the Jewish faith. After receiving his ordination in 1950, the petitioner was employed as the executive vice president of the Synagogue Council of America, which is a coordinating body of the major branches of Judaism. He continued at that position until 1960.

From 1960 to the present time, including all the years at issue, the petitioner has been employed by the American Jewish Committee as its national director of Interreligious Affairs. Also during the years in issue, the petitioner was a member of a large number of religious and rabbinical organizations. Included among these organizations were the Rabbinical Assembly of America, the New York Board of Rabbis, the Synagogue Council of America, the American Academy of Religion, the Society for the Scientific Study of Religion, the American Academy of Religion and Mental Health, and the American Association of Church Historians.

The American Jewish Committee, incorporated in 1911, is an organization formed with the following objectives, as provided in its charter:

to prevent the infraction of the civil and religious rights of Jews, in any part of the world; to render all lawful assistance and to take appropriate remedial action in the event of threatened or actual invasion or restriction of such rights, or of unfavorable discrimination with respect thereto; to secure for Jews equality of economic, social and educational opportunity; to alleviate the consequences of persecution and to afford relief from calamities affecting Jews, wherever they may occur; and to compass these ends to administer any relief fund which shall come into its possession or which may be received by it, in trust or otherwise, for any of the aforesaid objects or for purposes comprehended therein.

Any citizen of the United States who declares himself to be a Jew may become a member of the American Jewish Committee, upon payment of the required membership dues. Such citizen need not be an active participant in Jewish religious worship. Indeed, he could even be an active member of another religious faith.[2]

The membership of the American Jewish Committee selects both its officers and board of delegates. In turn, the officers and board of delegates constitute the membership of the executive council of the American Jewish Committee. The business affairs of the American Jewish Committee are conducted by said executive council, which meets twice a year, and by a board of governors, appointed by said executive council, which meets on a much more frequent basis.

No synagogue or group of rabbis controls the operation of the American Jewish Committee; rather, the ultimate authority in this regard resides with its membership.

At the time of trial, the total membership of the American Jewish Committee was aproximately 40,000 individuals. Traditionally, these members have been civic leaders in many of this country's communities.

In 1956, the attorney general of the State of New York ruled that under the social welfare laws of that State the American Jewish Committee came within the definitional language of "other religious agencies or organizations." In this opinion, the attorney general listed the activities of the American Jewish Committee to be as follows:

(1) continual investigation and exposure of organized anti-semites and other subversives; (2) countering anti-democratic propaganda with accurate information to the American people through radio, press, motion pictures, books and pamphlets, speakers and discussion groups; (3) enlisting in the fight against prejudice the cooperation of editors, publishers, labor and industrial leaders,

---

[2] For instance, a citizen who is a Jew by birth, but who is presently an active member of another religious faith, might desire to be a member of the American Jewish Committee.

veterans and youth leaders, ministers and educators; (4) initiating and supporting legal measures against discrimination or segregation in employment, education, housing, and the use of public accommodations; (5) determining, through scientific research and study, the origin and causation of prejudice, how it operates, and what can be done to eradicate it; (6) assisting local community relations organizations to counteract prejudice and discrimination in their communities; (7) organizing and strengthening AJC chapters in strategic cities throughout the country for the purpose of enlisting Jewish leadership and support for this program.

The organization also attempts to convey to the American public their interpretation of international problems involving Jews. In the past few years, its attentions in this regard have been focused primarily upon the alleged persecution of Soviet Jews and upon Israeli problems in the Middle East.

The American Jewish Committee also annually publishes a yearbook, which records the events and trends in Jewish life throughout the world, and organizes various colloquiums to discuss new methods of pursuing Jewish education in the United States.

During the years at issue, the American Jewish Committee was departmentalized as follows:

(1) Library of Jewish Information
(2) Public Information and Education Division
(3) Community Activities Department
(4) Foreign Affairs Department
(5) Commentary Department
(6) Department of Inter Group Regulations and Social Action
(7) Jewish Community Services Department
(8) Interreligious Affairs Department

As the national director of Interreligious Affairs for the American Jewish Committee, the petitioner's principal function is to interpret the basic tenets of Judaism to the Christian leadership and the Christian community, as well as interpreting the relationship of Christianity to Judaism within the Jewish community. This work involves him in study, research, lectures, seminars, and conferences with representatives of churches and synagogues, and requires close contact and work with Jewish and Christian clergymen and theologians.

In addition to his interreligious work, described above, petitioner sometimes performs religious functions for the individual employees and members of the American Jewish Committee. These functions have included officiating at various weddings, funerals, and religious ceremonies, counseling individuals with particular religious problems, and the performance of such other duties as the conducting of prayer services, deliverance of invocations and benedictions at appropriate occasions. These acts are not and have never been required of him in the performance of his duties as the national director of Interreligious Affairs.

In 1929, the American Jewish Committee requested and received from the Commissioner of Internal Revenue an exemption from Federal income taxes as an educational and charitable organization under the then applicable section of the Internal Revenue Code.

In 1951, after a review of the exempt status, the Commissioner of Internal Revenue determined that the American Jewish Committee was exempt from Federal income taxes under section 101(6) of the Internal Revenue Code of 1939 [3] as an organization organized and operated exclusively for education purposes. This was the status of the organization during the years at issue.

The Jewish religion is essentially lay oriented. It does not have an ecclesiastical structure comparable in role and function to that which exists in the Catholic community and also in many Protestant communities.

The traditional framework of the Jewish community is the local "kehillah," which, in Hebrew, is approximately definitive of the phrase "Jewish community." The kehillah binds together all Jews in the community. The actual association is implemented on the basis of ancient Talmudic law, which in turn derives its validity from the attachment of the members of the Jewish community to a common Jewish tradition.

The leadership of the Jewish community is essentially a lay leadership in partnership with the religious leadership. Each local kehillah hires a rabbi to be the spiritual teacher and leader of its congregation. The rabbi bears authority on the basis of his mastery of Jewish tradition and religious law—mastery which, in the present day, is derived from years of study in various religious seminaries. By virtue of his authority, the rabbi represents the kehillah in its relation with outside bodies and other religious sects.

During 1962, the petitioner and his family lived for a portion of the year in a five-room apartment, which consisted of a living room, dining room, kitchen, bedroom, and office. The office was used by the petitioner to do work, some of which was either directly or indirectly connected with his position on the American Jewish Committee.

During the latter part of 1962, the petitioner and his family moved into a seven-room apartment. He continued to reside in this apartment for the remainder of the years in issue. Beginning in 1962 and continuing through 1964, he had his apartment renovated, turning two of the rooms of the apartment into an office and library, respectively. Some of the work and research done by the petitioner there was either directly or indirectly related to his position on the American Jewish Committee.

During the calendar years 1963 and 1964, the petitioner rented two

---

[3] Since 1954, the applicable provision has been sec. 501(c)(3).

cabins for the summer. One of these cabins was used by him and his family as a summer residence; the other cabin was used by the petitioner as a retreat to write a book.

During the calendar years 1962 and 1963, the petitioner purchased various professional periodicals and books for use in his professional activities. On his Federal income tax returns for those years, he claimed deductions for such expenses in the amount of $245 and $207.95, respectively. The respondent did not and does not presently dispute this claim.

During the calendar year 1963, the petitioner incurred expenses in the total amount of $446.17 with respect to trips that he considered to be indirectly related to his employment with the American Jewish Committee. These expenses were not reimbursed to him by the American Jewish Committee.

During each of the years in issue, $5,000 of the amount paid to the petitioner by the American Jewish Committee for his services was specified and identified by the employer to be a "parish allowance." The petitioner treated the amount of $5,000 as a parsonage allowance within the meaning of section 107 and excluded that amount from his Federal income tax returns in each of those years.

In addition to claiming an exclusion of $5,000 under section 107, for each of the years in issue, the petitioner deducted on his Federal income tax returns certain expenditures which, if the exclusion is allowable, would be a part of the amount excluded. The amounts claimed by the petitioner on his returns are as follows:

| Expenses | 1962 | 1963 | 1964 |
|---|---|---|---|
| Rent | $547.07 | $1,052.15 | $916.38 |
| Telephone | 234.27 | 283.31 | 505.92 |
| Alterations | 1,731.48 | 1,364.69 | 678.55 |
| Electrical | 36.00 | 36.75 | 53.73 |
| Insurance | | | 108.55 |
| Totals | 2,548.82 | 2,736.90 | 2,263.13 |

In his notice of deficiency, the respondent disallowed the exclusion of $5,000 claimed by the petitioner. In addition, the respondent made the following adjustments to the taxable income reported by the petitioner during the years at issue:

(1) Respondent disallowed portions of the deductions claimed by the petitioner during each of the years at issue for rental expense, determining that such disallowed deductions had not been substantiated.

(2) For the calendar year 1963, respondent disallowed the deduction claimed by the petitioner as professional travel expenses, determining that such disallowed item had not been substantiated.

(3) For the calendar year 1964, respondent disallowed 50 percent of the deduction claimed by the petitioner as telephone expenses.

OPINION

The principal issue in this case is whether the petitioner during the years at issue was entitled to an exclusion from gross income of $5,000 as a parsonage allowance under section 107.

During the years at issue, the petitioner was employed by the American Jewish Committee as its national director of Interreligious Affairs. In its contract of employment with the petitioner, the American Jewish Committee provided for an annual "parish allowance" in the amount of $5,000. Petitioner contends that in each of the years in issue he is entitled to exclude from gross income this $5,000 as provided for under section 107.

On the other hand, the respondent contends that the petitioner is not entitled to exclude under section 107 any part of his compensation from the American Jewish Committee because he was not employed by a religious organization to perform ministerial functions. Respondent concedes that the petitioner was, and is, an "ordained minister." Cf. *Abraham A. Salkov*, 46 T.C. 190 (1966) ; *David Silverman*, 57 T.C. 727 (1972). However, respondent contends that (1) the American Jewish Committee is a secular organization and (2) the services rendered by the petitioner to the American Jewish Committee are not ordinarily the duties of a minister of the gospel "in the exercise of his ministry" as defined in sections 1.107–1(a) and 1.1402(c)–5, Income Tax Regs. Therefore, he concludes that the petitioner is not entitled to exclude the "parish allowance" from his gross income. We agree with the respondent.

Section 107 provides:

SEC. 107. RENTAL VALUE OF PARSONAGES.

In the case of a minister of the gospel, gross income does not include—
(1) the rental value of a home furnished to him as part of his compensation; or
(2) the rental allowance paid to him as part of his compensation, to the extent used by him to rent or provide a home.

Section 1.107–1(a), Income Tax Regs., provides in pertinent part as follows:

In order to qualify for the exclusion, the home or rental allowance must be provided as remuneration for services which are ordinarily the duties of a minister of the gospel. In general, the rules provided in § 1.1402(c)–5 will be applicable to such determination. * * *

In turn, section 1.1402(c)–5(b)(2), Income Tax Regs., sets forth three basic tests to be used in determining the duties of a "minister of the

gospel" that will so qualify. They are as follows: (1) "the ministration of sacerdotal functions and the conduct of religious worship"; (2) "the control, conduct, and maintenance of religious organizations (including the religious boards, societies, and other integral agencies of such organizations), under the authority of a religious body constituting a church or church denomination"; and (3) service performed "for an organization which is neither a religious organization nor operated as an integral agency of a religious organization," but which is "pursuant to an assignment or designation by a religious body constituting his church." The petitioner does not qualify for the exclusion under any of these tests.

The petitioner was not hired to perform "sacerdotal functions" or to conduct "religious worship"; rather, his job is to encourage and promote understanding of the history, ideals, and problems of Jews by other religious groups. Any other functions he may perform are by virtue of his own personal desires but are not cause for remuneration by the American Jewish Committee.

Further, the American Jewish Committee is clearly not a "religious organization." Its charter and its activities reveal conclusively that its aims are educational. The organization has never claimed otherwise, having asked for and having received tax-exempt status as an "educational organization" for many years under the provisions of section 501(c)(3). We are not impressed by the petitioner's assertion that membership in the organization is limited to Jews. We do not believe that this is, in itself, determinative of the character of the organization. In any case, the American Jewish Committee is limited to Jews only in the broadest sense. Anyone who declares himself to be a Jew and pays the membership dues can be a member of the organization.

In addition, the petitioner was not assigned to the American Jewish Committee by any religious body constituting his "church." In accepting his position with the American Jewish Committee, he functioned as an independent contractor, separate and apart from any association with a religious group.

The petitioner argues that the third test cannot be met by him because the Jewish faith does not have a hierarchal order, and consequently, does not assign rabbis to occupy positions such as his. He contends that this test focuses primarily upon the type of activity involved and that his work with the American Jewish Committee is of a type covered by the regulation. We cannot agree. The third test unequivocally requires that the petitioner be working "pursuant to an assignment or designation by a religious body constituting his church," sec. 1.1402(c)–5(b)(2)(v), Income Tax Regs., and in the instant case the petitioner clearly was not.

Moreover, and without regard to the regulations, we are convinced that the type of activity conducted by the petitioner in his position with the American Jewish Committee was not a ministerial function within the intendment of the statute. The petitioner's primary function for the American Jewish Committee was in the nature of public relations. He was hired to improve the image of Jews in the eyes of non-Jews throughout the country. The American Jewish Committee did not need to hire a rabbi to perform this task. Indeed, it appears that a theologian learned in Judaism could have performed the same function equally as well. Although the fact that the petitioner is an ordained rabbi may have been of some aid to him in his work, in our minds this is not enough to cause him to be considered a "minister of the gospel" for the purposes of section 107 during the years at issue.

In the alternative, petitioner contends that the Commissioner's regulations are discriminatory in denying to him the exclusion solely because his religious faith has no established hierarchy. Consequently, he contends that such regulations are unconstitutional as a violation of the "equal protection" clause of the United States Constitution.[4] We need not decide this question. We would deny the petitioner the exclusion in this case irrespective of the regulations.

Having thus determined that during the years at issue the petitioner was not entitled to an exclusion from gross income as provided by section 107, we must also consider issues involving claimed deductions by the petitioner during those years. These issues involve amounts allowable as deductions by the petitioner for an office within his apartment, for telephone calls made in the ordinary course of his business, for the purchase of professional publications, and for certain trips made by the petitioner, and alleged by him to have been made in the ordinary course of his business. The Commissioner has completely denied the claimed deductions for the trips. For each of the other items, the dispute between the parties involves the correct amounts allowable as deductions during the years at issue.[5] Concerning the phone and business publications expenses, the petitioner alleges deduc-

---

[4] The 14th amendment of the United States Constitution provides that "No State shall * * * deny to any person within its jurisdiction the equal protection of the laws." The fifth amendment provides that "No person shall * * * be deprived of * * * property, without due process of law; * * *." It has been held that the equal-protection guarantee of the 14th amendment applies to the 'Federal Government through the fifth amendment. *Shapiro* v. *Thompson*, 394 U.S. 618 (1969); *Bolling* v. *Sharpe*, 347 U.S. 497 (1954).

[5] Respondent argued in his brief that total amount claimed by the petitioner for office space should be disallowed. Respondent did not make this argument previously. This determination of an increased liability of the petitioner amounts to a new issue before this Court. It is well settled that new issues may not be raised for the first time on brief *William E. Robertson*, 55 T.C. 862 (1971); *Sidney Messer*, 52 T.C. 440 (1969); *Eleanor C. Shomaker*, 38 T.C. 192 (1962).

tions in excess of those originally claimed on his Federal income tax returns.

The determination of the respondent, of course, has the presumption of correctness. Rule 32, Tax Court Rules of Practice; *Helvering* v. *Taylor*, 293 U.S. 507 (1935). For each of the disputed items, we have concluded that the petitioner has not met his burden of rebutting this presumption. His evidence is vague and uncertain, consisting almost entirely of his own oral testimony unsubstantiated by documentary evidence. He did not even present arguments concerning these issues in brief. The petitioner has therefore not substantiated his claims, and we find and hold that the Commissioner's original determinations, as shown in his notice of deficiency, are correct.

*Decision will be entered under Rule 50.*