LAWRENCE D. BOYER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

LAWRENCE D. AND ROSEMARY J. BOYER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3839–74, 4164–75.     Filed December 28, 1977.

Lawrence D. Boyer, pro se.
*Alan M. Jacobson,* for the respondent.

HALL, *Judge:* Respondent determined a deficiency of $1,882.94 in petitioner Lawrence Boyer's 1970 income tax, plus an addition to the tax under section 6653(a)[1] of $94.14. For 1971, respondent determined a deficiency in petitioners' income tax of $2,204.06.

---

[1]All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue.

The issues for decision are:[2]

(1) Whether petitioner Lawrence Boyer is entitled to exclude certain sums from his gross income as ministerial rental allowances;

(2) Whether sections 1.107 and 1.1402, Income Tax Regs., unconstitutionally restrict petitioner's freedom of religion;

(3) Whether petitioner Lawrence Boyer is entitled to exclude from his gross income amounts withheld from his compensation and paid to the State Universities Retirement System;

(4) Whether petitioners are entitled to deduct certain "kennel" expenses as business expenses;

(5) Whether petitioners are entitled to deduct certain claimed charitable contributions;

(6) Whether petitioners are entitled to deduct certain legal expenses;

(7) Whether petitioners are entitled to deduct certain automobile, travel, hotel, and related expenses; and

(8) Whether the notice of deficiency for 1970 was invalid.

## FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are found accordingly.

At the time they filed their petitions, Lawrence Boyer and Rosemary Boyer resided in Crystal Lake, Ill. Rosemary Boyer is a party only by virtue of having filed a joint return for 1971 with her husband. When we hereafter refer to petitioner, we will be referring to Lawrence Boyer.

## 1. *Ministerial Rental Allowance*

United Methodist Church doctrine teaches that all Christians are ministers of the Church of Christ. However, only certain ministers are set apart by the process of ordination as deacons and elders. The basic governing bodies within the United Methodist Church are the annual conferences. Generally, these conferences are located within given geographic areas. There are two kinds of participants (members) in an annual conference—ordained ministers (hereafter referred to as ministers)

---

[2]Unless noted otherwise, these issues apply to both years in question. Respondent has conceded that petitioner Lawrence Boyer is not liable for an addition to tax under sec. 6653(a).

and laymen. Deacons are members on trial and elders are full members of the annual conference.

During 1970 and 1971 petitioner resided in Wonder Lake, Ill. During those years he was an ordained elder in the United Methodist Church, and a full member of the Northern Illinois Annual Conference of that Church.

The United Methodist Church is a hierarchical church. Each local church is part of the whole church and also has an existence in and of itself. The deacons on trial and elders are not members of local churches. Local church congregations do not hire or discharge their own pastors. Pastors are sent under the authority of the annual conference to work with the people of each local church.

Every full member of the annual conference must receive his appointment (work assignment) annually from the bishop. A basic responsibility of the bishop is to assign ministers to local churches. Some ministerial members of the annual conference are sent on special appointment to other than local churches.[3] Some of those on special appointments are covered under the pension (annuity) system of the church and some are not. Ministers on special assignment are considered "employees" of the conference even though on special assignment.

Generally a request for a minister's services on special appointment is generated by the entity that wants his services, although there are cases where the minister generates the request for his own services. Sometimes a minister goes out and finds a position on his own and then asks the institution to request a special appointment, but that is unusual. Ministers on appointment to the local churches receive their salaries locally and report the salaries to their conference. Ministers on special appointment receive their salaries locally and also are expected to report their salaries to the conference annually. However, not all persons on special appointment comply with these rules.

Petitioner began teaching business data processing at McHenry County College (a non-church-related State University school) (McHenry) in 1969. Petitioner did not prove or claim any church-related reason for securing such employment, and we infer that the job was taken for purely secular reasons—to make a living.

---

[3]For example, about a quarter of the ministers of the Northern Illinois Annual Conference were on special assignment in 1976. Most special appointments are to theological seminaries, or colleges, or social agencies.

The first request the Northern Illinois Annual Conference received from McHenry for petitioner's services was a letter dated May 28, 1970.[4] Petitioner apparently took the position on his own initiative and then had the school request the annual conference for his services. The conference did not negotiate with McHenry as to petitioner's salary or duties. During 1970 and 1971 petitioner was on special appointment without church annuity coverage. His employment contract with McHenry provided for salary of $13,954.13 in 1970 and $16,292.45 in 1971. During those 2 years the Northern Illinois Annual Conference and the Church made no payments to petitioner for his teaching at McHenry, and the Church had no claim on any of his salary. Had petitioner not been covered by the State Universities Retirement System, however, he would have been required to pay into the Church's pension fund. The Church has no claim on the money he paid into the State Universities Retirement System.

If McHenry for any reason wanted to dismiss petitioner, or break the teaching contract with him, at least theoretically, under the Church position, McHenry would be required to seek prior approval of the Church. But there was no contractual relationship demonstrated between the Church and McHenry, and it appears highly unlikely that McHenry would incur any liability to the Church by discharging petitioner.

It is seldom the case that a minister who is working for a non-church organization is provided with a parsonage or residence. Residences are primarily furnished to pastors of local congregations and in some cases to professors in church-related colleges and seminaries. Petitioner's employment contract with McHenry did not provide for either a residence or a rental allowance, nor did the college specify that any portion of his salary, as paid, was for a residence or rental allowance. However, the standing rules of the Northern Illinois Annual Conference provide:

It is the duty of the local church or agency, where applicable, to designate (by resolution in their minutes) in advance of payment, that portion of his [the minister's] compensation which is for housing, but when such a church or

---

[4]The text of the letter was as follows:

"Pursuant to the provisions of the 1969 United Methodist Discipline and as elsewhere provided, McHenry County College respectfully requests the appointment of Lawrence D. Boyer to its instructional staff."

agency to which a minister in full connection has been appointed as a Special Appointment, pays a cash salary and has neglected to act to set aside a portion of the cash salary as housing allowance, it is the policy of the Northern Illinois Annual Conference that such cash salary is understood to include a housing allowance. It shall then be proper for the minister to exclude from reportable income the actual cost of providing his quarters, not to exceed $2,400.00 annually. Also, he shall exclude actual costs paid out not to exceed $800.00 annually, for utilities, telephone, repair and upkeep in and about his quarters.

In his income tax returns, petitioner excluded $3,200 ($2,400 plus $800) from his gross income for each of the years in question.

## 2. Contributions to Retirement System

The college withheld weekly from petitioner's salary 8 percent of his compensation and paid it on his behalf to the State Universities Retirement System. Employee contributions into this plan had been ruled nondeductible by the Internal Revenue Service. Petitioner had a vested interest in the sums paid to the retirement system, and he was entitled to withdraw such sums with interest upon termination of his employment at McHenry. The United Methodist Church had no interest in his contributions to the retirement system. On his tax returns for both years in question petitioner excluded the amount withheld from his income.

## 3. "Kennel" Operation

During the years in question petitioner owned and operated a "kennel." In 1969 petitioner owned two dogs, Pepi, and an Airedale. Later he purchased a beagle for his daughter. Apparently the beagle and the Airedale were sold when two additional dogs were purchased for the kennel. One of his three remaining dogs was kept by petitioner's parents in Hutchinson, Kans. His former wife had requested that petitioner purchase the dogs so that she could have a small business (breeding dogs) of her own. However, petitioner's former wife left him in 1970, and pursuant to a court order he retained custody of the dogs and provided for their upkeep.

While petitioner had these dogs, he incurred various expenses (e.g., feeding, fencing, maintenance) on their behalf, totaling $168 in 1970 and $327.53 in 1971. In addition, on his 1970 tax return he claimed that $70 paid for utilities in 1970 (the portion

of his home utility bills which was allocable to the dogs) and $100 in attorney's fees (which were connected with his divorce) were part of the cost of maintaining the kennel. In 1971 he sold one litter of puppies for $135. In that year he was allowed by the divorce court to cease acting as custodian for the dogs; he dismantled the kennel and destroyed the two dogs in his custody. He claimed a loss of $245 for the destroyed dogs.

In 1970 petitioner claimed a loss of $338 from his operation of the kennel; in 1971 he claimed expenses of $327.53, a loss of $245, and gross income from the puppy sale of $135, for a net loss in the year of $437.53.

### 4. *Special Appointment Fund and Other "Charitable" Contributions*

Petitioner maintained four separate checking accounts at the Buhler State Bank, Buhler, Kans., titled "Special Appointment Fund" (Fund). The assets in the Fund were derived from several sources. First, petitioner would occasionally be given money by individuals to use either in his ministry or for whatever charitable purposes he saw fit. He placed these moneys in the Fund. Second, petitioner contributed his personal tithe to the Fund. Third, whenever petitioner was given a discount or rebate by a local merchant, he contributed the amount that he had saved "on behalf of" the merchant who had given him the discount. Finally, petitioner placed $6,600 of his own assets in the Fund in 1970 during the divorce proceedings with his former wife to prevent her from obtaining the money.

In 1969 petitioner transferred the assets of the Fund to a trust. Under this trust, the assets were to be used for the benefit of the United Methodist Church (or for other charitable purposes) during his lifetime, with the remainder going to his children at his death. He stated at trial that the Fund was used solely for needy individuals, especially students who needed assistance in college. The only student aid shown on petitioner's accounting was for the benefit of petitioner's daughter. In addition, petitioner used the Fund to purchase an automobile which he used for commuting to McHenry and for other personal business as well as for traveling on behalf of the Fund. On his tax returns for 1970 and 1971, he claimed contributions to the Fund and charitable contribution carryovers from previous

years of $13,173.04 for 1970, and $12,985.28 for 1971, and he claimed deductions for 30 percent[5] of his contribution base (i.e., adjusted gross income).

Petitioner also claimed charitable contributions (other than to the Fund) for 1970 of $74.38. He substantiated only a $20 contribution to the Nebraska Annual Conference of the Church.[6]

## 5. *Legal Expenses*

Petitioner incurred legal expenses of $783 in 1970 and $845.27 in 1971. These expenses were in addition to legal expenses petitioner claimed were incurred on behalf of the kennel. These legal expenses arose during petitioner's divorce proceedings, and were for the protection of his assets which he had placed in the Fund to prevent his wife from getting them.

## 6. *Automobile and Travel Expenses*

Petitioner claimed various automobile, travel, and entertainment expenditure deductions totaling $4,618.36 and $3,472 for 1970 and 1971, respectively.

Petitioner used one automobile for "business" and a different automobile for "personal" travel. The "business" automobile was used for commuting to McHenry[7] and travel related to maintenance of the Fund, the kennel, and his activities as a minister and teacher (other than commuting). Travel on behalf of the Fund included several visits to his parents' home in Hutchinson, Kans., as well as trips to Nebraska and Iowa.

Petitioner claimed that 90 percent of the miles driven in his "business" automobile was for deductible business purposes; he maintained a diary in which he recorded personal travel in his "business" automobile as well as his "business" travel. The diary shows that during 1970 petitioner drove 2,370 miles for purposes related to his ministry and teaching (other than commuting). The diary further shows that in 1971 he drove 1,630 miles for

---

[5]Petitioner claimed only 30 percent of his contribution base for both 1970 and 1971, although he was entitled to claim 50 percent of his contribution base for those years. Sec. 170(b)(1)(A).

[6]Petitioner claimed total contributions and carryovers of $13,244.44 and $13,318.75 for 1970 and 1971, respectively, of which $13,173.04 and $12,985.28 for 1970 and 1971, respectively, was attributable to the Fund. Respondent allowed petitioner a charitable contribution of $1,296.92 for 1971, but disallowed the claimed contributions for 1970 in their entirety.

[7]The total of petitioner's commuting miles is unknown. He lived approximately 15 miles from McHenry, but the number of days per week that he went to the college is unclear.

purposes related to his ministry and teaching (other than commuting). Petitioner also had hotel expenses of $60 and meal expenses of $48.44 in 1970 related to his teaching or ministry.[8]

## 7. *Validity of Statutory Notice*

Petitioner received a 30-day letter in January 1974 inviting him to a conference in Waukegan, which meeting he requested be changed to Woodstock. The next notification petitioner was sent from respondent was a request that petitioner consent to an extension of the statute of limitations, which request petitioner did not receive. Respondent then sent to petitioner (within the time provided by the statute of limitations) the statutory notice which is the basis for this action.

## OPINION

### 1. *Ministerial Rental Allowance*

The first issue is whether petitioner is entitled under section 107[9] to exclude from his gross income a ministerial rental allowance for each of the years in question. Respondent disallowed the claimed exclusions in their entirety.

Petitioner is an ordained elder (minister) of the United Methodist Church and was a full member of the Northern Illinois Annual Conference of the Church during the years in

---

[8]Petitioner claimed hotel, meal, and travel expenses of $1,185.36 for 1970. We find on the basis of his travel log for 1970 that only the following hotel bills were for activities related to his teaching or ministry:

| Date | Place | Amount |
|---|---|---|
| 6/3/70 | Stoughton, Wis. | $15 |
| 7/25/70 | Stoughton, Wis. | 15 |
| 6/7/70 | N. Ill. Conference | 30 |
| Total | | 60 |

Again using his calendar as our guide, we find that petitioner had the following deductible meal expenses in 1970:

| Date | Place | Amount |
|---|---|---|
| 6/11 | DeKalb | $3.89 |
| 1/13 | Chicago | 13.05 |
| 2/28 | Chicago | 17.35 |
| 5/13 | Heidelberger | 14.15 |
| Total | | 48.44 |

[9]Sec. 107 provides in part:

In the case of a minister of the gospel, gross income does not include—

(1) the rental value of a home furnished to him as part of his compensation; or

(2) the rental allowance paid to him as part of his compensation, to the extent used by him to rent or provide a home.

issue. The conferences are the governing bodies of the Church. The bishop of the Northern Illinois Annual Conference annually assigns the elders who are full members of that conference to work with the local churches and other organizations. Those elders not assigned to local churches receive special assignments to organizations, usually church-related seminaries, or colleges, or social agencies, which request their services. Some Elders seek positions on their own and then have their employer "request" their services from the conference. That was the situation in petitioner's case.

In 1969 petitioner sought and obtained employment as a business data processing teacher at McHenry County College (a nonsectarian, Illinois State University school). He taught data processing classes at the school in 1969 and in the years in issue, and was paid a salary by the school for his work. On May 28, 1970, the president of McHenry, apparently at petitioner's request, wrote a letter to the conference asking that petitioner be appointed to the position in which he had then been serving for some time. The conference thereupon specially appointed petitioner to the teaching job at McHenry County College, and such appointment was renewed for the second year in issue.

Petitioner's employment contract with McHenry did not provide either a residence or a rental allowance, nor did McHenry specify that any portion of petitioner's salary, as paid, was for a residence. However, the standing rules of the Northern Illinois Annual Conference (Standing Rules) purported to provide that even in the absence of a specific rental allowance in a special appointment contract, a minister is entitled to exclude from his reportable income a housing allowance of up to $2,400, and a utilities and upkeep allowance of up to $800. Petitioner claimed an annual ministerial residence allowance of $3,200 for the years in issue, which claim respondent has disallowed.

Section 107 allows a minister of the gospel[10] to exclude from gross income a rental allowance paid to him as part of his compensation, but only to the extent that allowance is used by him to rent or provide a home.[11] In order for a minister to be

---

[10]The phrase "minister of the gospel" applies to individuals having ministerial status in their respective religions. *Salkov v. Commissioner,* 46 T.C. 190, 194 (1966).

[11]Respondent did not argue that petitioner failed to substantiate that the claimed rental allowance was used to furnish him with a home.

eligible for this exclusion, respondent's regulations require: (1) That the home or rental allowance be provided as remuneration for services which are ordinarily the duties of a minister of the gospel (sec. 1.107–1(a), Income Tax Regs.); (2) that prior to payment of this rental allowance, the employing church or other qualified organization must designate the rental allowance in an employment contract or by any other appropriate instrument (sec. 1.107–1(b), Income Tax Regs.); and (3) that the designation must be sufficient in that it clearly identifies the portion of the minister's salary that is the rental allowance (sec. 1.107–1(b), Income Tax Regs.).[12] Respondent contends that petitioner, employed by a secular, non-church-related institution to perform nonsacerdotal duties, does not meet these requirements. Petitioner contends that under the regulations he is entitled to the exclusion delineated in the Standing Rules or, in the alternative, that respondent's regulations are unconstitutional since the regulations restrictively interpret the duties of a minister.

First we must consider whether petitioner received a rental allowance as remuneration for services which are "ordinarily the duties of a minister." The regulations provide that this

---

[12]Regulation sec. 1.107(a) and (b) provides:

(a) In the case of a minister of the gospel, gross income does not include (1) the rental value of a home, including utilities, furnished to him as a part of his compensation, or (2) the rental allowance paid to him as part of his compensation to the extent such allowance is used by him to rent or otherwise provide a home. In order to qualify for the exclusion, the home or rental allowance must be provided as remuneration for services which are ordinarily the duties of a minister of the gospel. In general, the rules provided in sec. 1.1402(c)–5 will be applicable to such determination. Examples of specific services the performance of which will be considered duties of a minister for purposes of section 107 include the performance of sacerdotal functions, the conduct of religious worship, the administration and maintenance of religious organizations and their integral agencies, and the performance of teaching and administrative duties at theological seminaries. Also, the service performed by a qualified minister as an employee of the United States (other than as a chaplain in the Armed Forces, whose service is considered to be that of a commissioned officer in his capacity as such, and not as a minister in the exercise of his ministry), or a State, Territory, or possession of the United States, or a political subdivision of any of the foregoing, or the District of Columbia, is in the exercise of his ministry provided the service performed includes such services as are ordinarily the duties of a minister.

(b) For purposes of section 107, the term "home" means a dwelling place (including furnishings) and the appurtenances thereto, such as a garage. The term "rental allowance" means an amount paid to a minister to rent or otherwise provide a home if such amount is designated as rental allowance pursuant to official action taken prior to January 1, 1958, by the employing church or other qualified organization, or if such amount is designated as rental allowance pursuant to official action taken in advance of such payment by the employing church or other qualified organization when paid after December 31, 1957. The designation of an amount as rental allowance may be evidenced in an employment contract, in minutes of or in a resolution by a church or other qualified organization or in its budget, or in any other appropriate instrument evidencing such official action. The designation referred to in this paragraph is a sufficient designation if it permits a payment or a part thereof to be identified as a payment or rental allowance as distinguished from salary or other remuneration.

determination is governed by "In general, the rules provided by sec. 1.1402(c)–5." Section 1.1402(c)–5(b)(2) of respondent's regulations provides, for purposes of exemption from self-employment tax, rules that determine whether particular services performed by an ordained minister are in the exercise of his ministry. This Court has concluded that these rules are a reasonable interpretation of section 107 and should be used in determining whether an individual's service is performed in the exercise of his ministry. *Toavs v. Commissioner*, 67 T.C. 897, 903 (1977).

Regulations section 1.1402(c)–5(b)(2) provides generally that the "service performed by a minister in the exercise of his ministry includes the ministration of sacerdotal functions and the conduct of religious worship, and the control, conduct and maintenance of religious organizations (including the religious boards, societies, and other integral agencies of such organizations), under the authority of a religious body constituting a church or church denomination." Then the regulations set forth five rules for determining whether services performed by a minister are performed in the exercise of his ministry. Petitioner clearly does not perform duties described in the first four rules, but claims he comes within the fifth rule.[13] This rule provides that if a minister, pursuant to an assignment by his church, performs services for an organization which is neither a religious organization nor operated as an integral agency of a religious organization, all service performed by him, even though such service may not involve the conduct of religious worship or the administration of sacerdotal functions, is in the exercise of his ministry.

It could be argued that petitioner satisfied the requirements of this category (since he was ostensibly assigned to McHenry by

---

[13]Sec. 1.1402(c)–5(b)(2)(v), Income Tax Regs., provides:

(v) If a minister, pursuant to an assignment or designation by a religious body constituting his church, performs service for an organization which is neither a religious organization nor operated as an integral agency of a religious organization, all service performed by him, even though such service may not involve the conduct of religious worship or the ministration of sacerdotal functions, is in the exercise of his ministry. The application of this rule may be illustrated by the following example:

*Example.* M, a duly ordained minister, is assigned by X, the religious body constituting his church, to perform advisory service to Y Company in connection with the publication of a book dealing with the history of M's church denomination. Y is neither a religious organization nor operated as an integral agency of a religious organization. M performs no other service for X or Y. M is performing service in the exercise of his ministry.

his church), and, therefore, his teaching was in the exercise of his ministry. However, we are convinced that the regulations under section 107 and section 1402 do not require this result. We reach this conclusion for several reasons. First, we are not convinced that petitioner's "assignment" to McHenry was the type of assignment envisaged in these regulations.[14] Petitioner began teaching at McHenry in 1969; McHenry requested his assignment to the college in May 1970, after he had completed an academic year at the institution. His assignment to McHenry was vitually pro forma—the ratification by the church of employment previously begun. In contrast, we believe that the "assignment" referred to in the regulations must be significant, in that the minister must have been assigned by the church for reasons directly related to the accomplishment of purposes of the church. Unless we read these regulations to require a genuine church-related purpose in the church's assignment of the minister, bootstrapping of the type attempted here by petitioner would enable any ordained minister, merely by obtaining a pro forma "assignment" after he secures secular employment, to qualify for the ministerial rental exclusion. Cf. *Tanenbaum v. Commissioner*, 58 T.C. 1, 9 (1972). The special benefits of section 107 would follow him through a purely secular career. We do not believe that Congress intended any such result. More is required than mere ordained status and the perfunctory ratification by religious authority of secular employment obtained by the minister for non-church-related reasons.

We draw support for this conclusion from the example given in section 1.1402(c)–5(b)(2)(v), Income Tax Regs.[15] In this example a duly ordained minister was assigned by his church to perform advisory service to a lay institution, but the service was related to the church's functions. On the basis of this example we conclude that these regulations contain an implicit require-

---

[14] The legislative history for this section does not aid the interpretation of these regulations, which must be sustained unless unreasonable and plainly inconsistent with the statute. *Commissioner v. South Texas Co.*, 333 U.S. 496, 501 (1948). Sec. 1402(c)(4) was added to the Code by the Social Security Act Amendments of 1950. The House and Senate reports for this provision are ambiguous; the reports simply state that "service by a duly ordained * * * minister * * * in the exercise of duties required by [a religious] order" are within the exception to self-employment taxes provided in sec. 1402, but also that this "applies to the performance of services which are ordinarily the duties of such ministers." 1950 U.S. Code Cong. Service 3460.

[15] See n. 13 *supra*.

ment that the assignment by the church must be to further the purposes of the church.[16] Accordingly, petitioner's assignment in this case did not qualify as an assignment which transformed his secular duties at a State University school into service in the exercise of his ministry.

Second, even if we were to conclude that petitioner's assignment by the Northern Illinois Annual Conference was a valid "assignment" within the meaning of regulations section 1.1402(c)–5(b)(2)(v), we do not believe that this finding would mandate the ultimate conclusion that his activities were "ordinarily the duties of a minister of the gospel" within the meaning of section 1.107–1(a), Income Tax Regs. Section 1.107–1(a) provides only that *in general* the rules provided in section 1.1402(c)–5 are used in determining whether services qualify for the ministerial rental exclusion. The words "in general" imply that section 1.107–1(a) only refers to section 1.1402(c)–5 for guidance, not for a mechanistic determination. The statute still requires, for the ministerial rental allowance, that the duties performed be those ordinarily performed by a minister of the gospel. Petitioner's duties as an instructor of business data processing at a secular institution clearly do not fall within the ordinary range of such duties, and accordingly, he is not entitled to the minsterial rental exclusion even if the regulations under section 1.1402(c)–5 are deemed satisfied.

But even if we were to assume, arguendo, that petitioner's teaching pursuant to an assignment by his church is within the exercise of his ministry, he still would not be entitled to the exclusion, since he fails to meet the second requirement of regulations section 1.107–1, that prior to payment of the rental allowance, the employing organization must designate the rental allowance in the employment contract or by other appropriate instrument. In this case, petitioner's rental allowance was not designated in his employment contract or in any other appropriate instrument. Petitioner contends, however, that the designation in the Standing Rules of the Northern Illinois Annual Conference was incorporated by reference into his employment

---

[16]Bishop Washburn of the Northern Illinois Conference testified that he could see "some possibility" that petitioner's teaching at McHenry could further the goals of the church, since petitioner could "modify his teaching somewhat by his religious stance." We consider this possible benefit to the church to be too insignificant to qualify under sec. 1.1402(c)–5(b)(2)(v). The relationship of business data processing to the minstry is at best tangential.

contract with McHenry. We are not persuaded. If we were to agree with such contention, any church could, again, bootstrap the ministerial rental allowance merely by passing a resolution denominating the amount of that allowance for all of the church's ministers. We read regulation section 1.107–1(b), however, to require a specific designation for each minister. Although the regulation is broadly worded to allow the designation to be made in "any other appropriate instrument," the designation must still be personal, not a general designation for all the ministers of any religious organization. Therefore, we conclude that there was not a sufficient designation of a rental allowance as to petitioner, personally; accordingly, his claimed exclusion must be denied.

Petitioner also asserts that the regulations (pursuant to which we cannot accord to him a ministerial rental exclusion) are unconstitutional because the regulations embody religious determinations made by a governmental agency. In essence petitioner contends that by drafting these regulations, the Internal Revenue Service was restricting petitioner's free exercise of his religion.

Petitioner's constitutional argument in this case is self-defeating. If we were to conclude that these regulations unconstitutionally involve the Federal Government in religious matters, we would be forced to reach a similar conclusion as to section 107 itself. Petitioner's constitutional argument would lead to disallowance of the ministerial rental allowance which he seeks. We do not agree with petitioner's basic contention that these regulations embody religious restrictions. We conclude these are valid income tax regulations, and on the basis of these regulations we hold that petitioner is not entitled to a ministerial rental exclusion for the years in question. Petitioner invokes the establishment clause as support for the theory that mere ordination, and ratification of his secular pursuits, entitles him in effect to carry his ministerial rental allowance on his back into secular employment. We might be inclined to reach the opposite conclusion: were section 107 to be so construed, the startling tax preference it would accord to the merely ordained would indeed raise constitutional problems. Since it is clear that Congress did not intend any such result, we are fortunately not constrained to consider such problems.

## 2. *Contributions to Retirement System*

The second issue is whether petitioner is entitled to exclude from his gross income amount withheld from his compensation and paid to the State Universities Retirement System. Respondent has determined that the 8 percent of petitioner's salary which was withheld annually and paid over to the retirement system must be reflected in his gross income, and we agree.

Under the retirement plan[17] in effect at McHenry during 1970 and 1971, 8 percent of petitioner's earnings was withheld from his salary. However, petitioner had a vested right in these moneys; upon his termination he could either retain the retirement benefits or receive a refund of his contributions, plus interest.

It is well established that compulsory contributions from an employee's salary into a governmental retirement fund in which that employee has a nonforfeitable right must be reported as gross income. *Hogan v. United States*, 513 F.2d 170, 173 (6th Cir. 1975); *Megibow v. Commissioner*, 218 F.2d 687 (3d Cir. 1955); *Feistman v. Commissioner*, 63 T.C. 129, 133 (1974).

Petitioner asserts, however, that his contributions to the State Universities Retirement System were made in lieu of contributions to the United Methodist Church pension plan which would have been mandatory had he not been on special appointment. Petitioner contends that since he would not have retained any equity in his contributions to the church's fund, those contributions would have been excludable. He contends, accordingly, that his contributions to McHenry's retirement fund were similar reductions in his salary pursuant to church law. We need not consider, however, whether contributions to the church's retirement fund would be excludable. In this case the church had no equity in petitioner's contributions to the State Universities Retirement System, while petitioner had nonforfeitable rights to these contributions. Such contributions are clearly includable as gross income to petitioner.

## 3. *"Kennel" Operation*

The next issue is whether petitioner may deduct expenses

---

[17]The Internal Revenue Service has ruled that employee contributions paid under this plan are not excludable.

related to his kennel during the years in question. Petitioner claimed expenses of $338.50 in 1970 and losses and expenses of $572.53 in 1971 related to his kennel operation. Petitioner started the kennel for his former wife in 1969; when she left him in 1970, he kept custody of the dogs under court order. He owned three dogs during the years in question, one of which was kept by his parents in Kansas. In 1971, when the court order was lifted, he destroyed the two dogs in his immediate custody. He claimed a deduction for the loss due to the destruction of the dogs as well as the expenses of their maintenance prior to that time. Respondent disallowed these deductions in their entirety.

Petitioner contends that these expenses and losses are deductible under either section 162 or 212 on the grounds that his kennel was a business engaged in for profit. For expenses to be allowed as a deduction under either section, petitioner must establish that the activity was engaged in for profit. *Benz v. Commissioner*, 63 T.C. 375, 382 (1974). In making this determination, we look to section 183 (Activities Not Engaged in for Profit) and the regulations thereunder. Section 183[18] provides generally that expenses related to activities not engaged in for profit are deductible only to the extent of the gross income of the activity.

Section 1.183-2 of the regulations defines an "activity not

---

[18]Sec. 183 provides in pertinent part:

(a) GENERAL RULE.—In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.

(b) DEDUCTIONS ALLOWABLE.—In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed—

(1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and

(2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).

(c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.—For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.

(d) PRESUMPTION.—If the gross income derived from an activity for 2 or more of the taxable years in the period of 5 consecutive taxable years which ends with the taxable year exceeds the deductions attributable to such activity (determined without regard to whether or not such activity is engaged in for profit), then, unless the Secretary or his delegate establishes to the contrary, such activity shall be presumed for puposes of this chapter for such taxable year to be an activity engaged in for profit. In the case of an activity which consists in major part of the breeding, training, showing, of racing of horses, the preceding sentence shall be applied by substituting the period of 7 consecutive taxable years for the period of 5 consecutive taxable years.

engaged in for profit." This regulation provides that several objective factors should be used in determining whether an activity is engaged in for profit. The following nine factors are listed as among those which indicate that an activity is engaged in for profit:

(1) The taxpayer carries on the activity in a businesslike manner;

(2) The taxpayer or his advisor has expertise in the field;

(3) The taxpayer expends considerable time and effort in carrying on the activity;

(4) The expectation that assets used in the activity may appreciate in value;

(5) The success of the taxpayer in carrying on other similar activities;

(6) The taxpayer's history of income with respect to the activity;

(7) The amount of occasional profits which are earned;

(8) The taxpayer's lack of substantial income or capital;

(9) The lack of appeal in the activity other than profit.

In addition, section 183(d) contains a presumption that an activity is engaged in for profit if the gross income therefrom exceeds deductions allowable in any 2 of 5 consecutive years.[19]

The burden of proving that his intention was to make a profit is on petitioner. Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioner attempts to establish that his kennel was an activity engaged in for profit by reference to several facts. First, he notes that in 1971 he sold one litter of puppies for $135. Second, he asserts that his intention that the kennel operate for a profit was established in a letter written by his former wife (in which she states that petitioner bought her the dogs in order to appease her request to work and to provide her with company). Third, he produced his correspondence with several pet stores, which he asserts establishes his intention to operate the kennel for profit.

Applying the factors set forth in the regulations, we are unconvinced that petitioner intended to operate his kennel for profit. He proved no expertise in this activity, offered no evidence that he spent any significant amount of time or energy

---

[19]Since petitioner operated this kennel only for a total of 3 years, and always at a loss, the presumption is inapplicable in this case.

on this activity, and apparently had little success in the venture. We find three other factors even more indicative of petitioner's lack of intent to operate the kennel as a business for profit. First, his parents kept one of the three dogs in Kansas; we find it difficult to believe that a businessman raising dogs would keep one of his limited stock several hundred miles away. Second, he destroyed the dogs at his first opportunity (and claimed a loss); again, we doubt that a profit-oriented businessman would destroy, rather than sell, dogs valued at $245. Finally, the kennel had a continuing record of losses. In *Bessenyey v. Commissioner*, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967), we noted that a record of continuing losses is an important factor in determining the taxpayer's true intentions. Looking at all the facts, we are convinced that petitioner has failed to prove his intent to operate the kennel as a profitmaking activity. Cf. *Benz v. Commissioner*, *supra*. Accordingly, we agree with respondent's determination that petitioner was not entitled to the claimed deductions arising from his kennel operation.

### 4. *Special Appointment Fund and Other "Charitable" Contributions*

The next issue is whether petitioner is entitled to deduct various charitable contributions claimed in 1970 and 1971. Respondent allowed a deduction for contributions of $1,296.92 in 1971. However, respondent disallowed petitioner's claimed carryovers from previous years for both 1970 and 1971, as well as other miscellaneous charitable deductions in 1970.

Petitioner's claimed carryovers and the current contributions to the Special Appointment Fund (Fund) both present the same issue,[20] namely, whether petitioner's Fund constitutes a charitable organization within the meaning of section 170. Section 170 allows deductions for contributions to any fund "organized and operated exclusively for religious, charitable * * * purposes." Petitioner argues that the Fund which he created is an extension of his ministry, and that from this Fund he made distributions to the needy as well as supported his activities as a minister. However, he had introduced no evidence of distributions to the unrelated needy, and we have found that the proceeds of the

---

[20]All the carryovers were apparently for contributions to the Fund in prior years.

Fund were used to pay for his automobile and his daughter's college education. We need not consider, therefore, whether the Fund was organized exclusively for religious or charitable purposes, since the operation of the Fund was clearly for petitioner's personal use. *DuBois v. Commissioner*, 31 B.T.A. 239, 240 (1934). Cf. *Old Dominion Box Co. v. United States*, 477 F.2d 340, 344 (4th Cir. 1973). Accordingly, respondent's determination that petitioner is not entitled to a deduction for contributions to the Fund is sustained.

Respondent also disallowed various other contributions claimed by petitioner for 1970. Petitioner offered no evidence that any of these organizations was organized and operated exclusively for charitable purposes; we note, however, that the United Methodist Church and its regional conferences are recognized as qualified charitable organizations by respondent.[21] Accordingly, petitioner is entitled to a $20 deduction in 1970 for a contribution to the Nebraska Annual Conference which he substantiated.

## 5. *Legal Expenses*

The next issue is whether petitioner may deduct various legal expenses incurred in obtaining a divorce. Petitioner claimed deductions for legal expenses of $783 and $845.27 in 1970 and 1971, respectively. These legal expenses were primarily for preservation of the assets of the Fund. Petitioner contended, accordingly, that these expenses were deductible expenditures of his ministry. We disagree. First, we have found as a fact that the Fund was not an extension of petitioner's ministry but rather a personal fund. Second, these legal expenses arose due to petitioner's divorce. In *United States v. Gilmore*, 372 U.S. 39, 48 (1963), the Supreme Court held that the deductibility of legal expenses is determined by the origin and nature of a claim rather than its consequences, so that legal expenses incurred in a divorce proceeding in an effort to keep a wife from acquiring title to stock were nondeductible. In this case, since the claim likewise arose from a personal matter, petitioner's divorce, the legal expenditures are not deductible merely because petitioner

---

[21]Treas. Dept., Cumulative List of Organizations, p. 354 (Pub. 78, 1968 rev.)

sought to conceal assets from his wife in connection with the divorce.

## 6. *Automobile and Travel Expenses*

The next issue is whether petitioner is entitled to various deductions for automobile, travel, hotel, and meal expenditures. Respondent determined that the following deductions claimed by petitioner should be disallowed in their entirety:

| Type | 1970 | 1971 |
|---|---|---|
| Automobile | $2,372.00 | $2,411 |
| Depreciation (auto) | 1,061.00 | 1,061 |
| Travel | 519.00 | ([22]) |
| Hotel and meals | 666.36 | ([22]) |

The burden of substantiating these deductions is upon petitioner. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. As to the automobile and depreciation deductions, he asserted that he drove 38,998 business miles in 1970 and 43,985 business miles in 1971. He owned two automobiles during the years in question. One automobile—the "personal" one—was used by his former wife, while he used the "business" automobile. He maintained a diary for both years in which he recorded any personal trips in the "business" automobile as well as his various business trips. Petitioner asserted that all the mileage on his "business" automobile (except the personal miles noted in the diary) was for business purposes, specifically his teaching (including commuting to McHenry), his kennel, his ministerial activity, and maintenance of the Fund.[23]

Respondent contends that petitioner may not establish his automobile mileage by assuming that all the mileage on the "business" automobile is for business and subtracting the personal mileage. We need not reach this contention, however, since petitioner's own diary establishes that a large portion of the "business" automobile expenditures was not deductible. In particular, the diary establishes that expenses for his commuting

---

[22]Respondent allowed as charitable contributions $474.19 for hotel and travel expenditures in 1971.

[23]Petitioner claimed a deduction for only 90 percent of the mileage on his "business" automobile. Apparently he had been previously advised by an Internal Revenue Service agent to claim this percentage deduction. Since we rely on his diary in determining his automobile deductions, we do not consider the effect of his choice of deducting 90 percent of the mileage on the "business" automobile.

(to McHenry), kennel expenses, and activities on behalf of the Fund were a large percentage of the recorded mileage.[24] We have already concluded that the kennel was not a business engaged in for profit; driving on behalf of the kennel is not deductible. Similarly, we have found that expenditures on behalf of the Fund are personal. As to the commuting expenses, petitioner asserts that his home was his place of employment (as a minister), so that his cost of traveling to McHenry is deductible. We disagree with petitioner's contention. We have consistently held that "home" for purposes of section 162 means the taxpayer's principal place of employment. See, e.g., *Bochner v. Commissioner*, 67 T.C. 824, 827 (1977); *Kroll v. Commissioner*, 49 T.C. 557, 561–562 (1968). In this case, petitioner's principal place of employment for both years in question was McHenry; he commuted to McHenry from his home in Wonder Lake. These commuting expenses are not deductible.

Petitioner's diaries account for less than 20 percent of the miles he asserted he drove for business purposes each year. However, we have no evidence to establish that any mileage other than that recorded was for other than personal purposes. Petitioner did not establish whether all these remaining miles were logged for commuting (or other personal purposes) or were pursuant to his teaching or ministry. Absent such proof, and in light of petitioner's mistaken belief that he could deduct expenses of driving to and from work, and driving on behalf of the Fund and kennel, we cannot conclude how many, if any, of the remaining miles were deductible. See, e.g., *Schmidt v. Commissioner*, an unreported case (7th Cir. 1970, 25 AFTR 2d 70–1353, 70–2 USTC par. 9617), affg. a Memorandum Opinion of this Court. Since petitioner has not established what portion, if any, of the remaining claimed mileage was for business purposes, we must restrict our attention to the travel for which a diary was maintained.

Petitioner asserted that all the travel itemized in his diary was for business purposes, but we have found, after a detailed review of the record, that only 2,370 miles in 1970 and 1,630 miles in 1971 were for purposes related to his ministry and teaching (other than commuting). Since petitioner did not establish the

---

[24]In 1970 at least 50 percent of the mileage for which records were maintained was nondeductible; for 1971, at least 75 percent was nondeductible.

cost of these trips, he is entitled to deduct 12 cents per mile, Rev. Proc. 70–25, 1970–2 C.B. 506, or $284.40 and $195.60 in 1970 and 1971, respectively. These deductions include an allowance for depreciation for both years.

Petitioner also deducted various travel, hotel, and meal expenditures for 1970, which respondent disallowed in their entirety. These deductions were for activities related to petitioner's teaching, ministry, and maintenance of the Fund. Petitioner argues that all these expenditures are deductible under either section 162 or section 212; respondent argues that all these expenditures were personal or, in the alternative, that petitioner failed to substantiate the amount and purpose of these expenditures.

We have held that petitioner's Fund was not an extension of his ministry but, rather, a personal fund; accordingly, travel expenses on behalf of the Fund are not deductible as ordinary and necessary expenses under section 162. Petitioner did not argue, and presented no proof, that the Fund was an activity engaged in for profit; in addition, since petitioner claimed that the Fund was connected to his ministry, he refused to supply information concerning his specific activities during these trips on grounds of ministerial privilege. Accordingly, we lack any basis for concluding that petitioner's travel expenditures on behalf of the Fund are deductible under section 212 as expenses for the management of property held for the production of income.

Petitioner also claimed travel and hotel deductions for trips related to his teaching and his ministry. Since teaching and the ministry both constitute petitioner's trade or business, these expenditures, if substantiated, are deductible pursuant to section 162. In this case, substantiation must be based on petitioner's diary for 1970. We have found, by comparing petitioner's diary against the claimed travel and hotel expenditures, that $60 for hotels in 1970 was pursuant to his teaching or his ministry.

Petitioner also claimed deductions for meals in 1970, apparently relying on either section 212 or section 162. Since we have already concluded that expenditures related to his activities on behalf of the Fund are not deductible, we only need determine whether petitioner is entitled to deduct meal expenditures related to his teaching or his ministry.

Section 162 allows a deduction for meals "while away from home." The Supreme Court has held in *United States v. Correll*, 389 U.S. 299, 302–304 (1967), that the phrase "away from home" means travel which takes the taxpayer away from home overnight. Meals consumed on the road when travel is not overnight are not deductible. In this case, from petitioner's diary we have determined that $31.66 spent for meals at McHenry was not for meals associated with overnight travel and no deduction may be taken, while $3.89 for a meal at the Northern Illinois Conference was related to an overnight expenditure and can be deducted.

The remaining $44.55 claimed meal deduction for 1970 is for meals at business lunches in Chicago. For business lunches to be deductible, petitioner must meet the requirements of both section 162 and section 274. If the lunches are ordinary and necessary under section 162, the taxpayer must still establish, pursuant to section 274, that the meals were furnished under circumstances generally conducive to a business discussion, as well as produce substantiation of the expense. In this case petitioner testified that the meals were also business meetings for discussions of computer technology. His diary supports his claim, and he substantiated the expenses with credit card receipts. We conclude that petitioner has met his burden of proving that these meals were part of business meetings, and accordingly, we find petitioner is entitled to deduct $48.44 for meals. See *Brown v. United States*, 280 F. Supp. 854 (D. N.M. 1967).

### 7. *Validity of Statutory Notice*

Finally, petitioner asserted that the notice of deficiency for 1970 is invalid because, first, he was deprived of his right to a conference with the Internal Revenue Service prior to issuance of the statutory notice, and, second, the Commissioner's action against him was arbitrary. Petitioner received a 30-day notice and requested that the conference be transferred from Waukegan, Ill., to Woodstock, Ill. The next communication respondent sent petitioner was a request to extend the statute of limitations, which request petitioner never received. Thereafter respondent sent petitioner the statutory notice. Petitioner contends he was denied his right to a meeting with the auditors; he asserts, therefore, that the statutory notice was invalid.

Although we sympathize with petitioner's expressions of frustrations arising from this chain of events, this Court does not look behind the deficiency notice to examine the Commissioner's motives or procedures in asserting the deficiency. *Crowther v. Commissioner,* 28 T.C. 1293, 1301 (1957), affd. on this issue 269 F.2d 292 (9th Cir. 1959). See *Lincoln Savings & Loan Association v. Commissioner,* 51 T.C. 82, 107 (1968), revd. on another issue 422 F.2d 90 (9th Cir. 1970), revd. 403 U.S. 345 (1971). Accordingly, we hold that the notice of deficiency for 1970 was valid.

*Decisions will be entered under Rule 155.*