ERNEST C. SWIGERT, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Swigert v. Commissioner
Docket Nos. 255-80, 15780-80.
United States Tax Court
T.C. Memo 1982-500; 1982 Tax Ct. Memo LEXIS 244; 44 T.C.M. (CCH) 992; T.C.M. (RIA) 82500; August 31, 1982. *244 Held: Petitioner's chartering of a canal barge was not an activity engaged in for profit. Homer W. Keller,James D. Broadway,Steven H. Vogel, and Cheryl Dunlavey Ogolin, for the petitioner. Gerald Beaudoin, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge:* Respondent determined deficiencies in petitioner's Federal income tax and additions to tax in the following amounts: Addition to Tax
Year
Deficiency
Sec. 6651(a) [1]
1970
$22,270.56
$5,567.64
1971
17,478.90
4,369.72
1972
40,181.83
10,045.46
1973
21,781.62
5,445.51
1974
22,025.00
6,284.00
1975
35,864.00
13,862.00
1976
21,422.00
9,055.00
1977
20,904.00
1978
9,997.00
The primary issue for decision is whether petitioner is precluded from deducting net operating losses claimed with respect to his chartering of a canal barge on the ground that his boat chartering operation was not an activity engaged in for profit. We must also determine whether *245 petitioner's failure to timely file his income tax returns for the years 1970 through 1976 was due to reasonable cause. FINDINGS OF FACT The stipulation of facts and exhibits attached thereto are incorporated herein by reference. It is stipulated that petitioner was a resident of Nijmegen, The Netherlands, when he filed the petition in this case. Petitioner is unmarried. Petitioner was employed by Hyster Company in Peoria, Illinois, from 1949 through November 1952, at which time he was transferred to Nijmegen, The Netherlands. In Nijmegen, he was assistant managing director of Hyster B.V., a subsidiary of Hyster Company, and was involved in the organization and development of a manufacturing plant established by Hyster Company in Nijmegen. After this subsidiary was fully organized, Hyster Company proposed to transfer petitioner to Sao Paulo, Brazil, to organize another subsidiary in that country. Petitioner declined the transfer, and as of Janury 1, 1960, he ceased working for Hyster Company. In 1956 petitioner built a small boat, which he used as a place where he could go and relax. When he decided to remain in The Netherlands rather than accept the proposed transfer to Brazil, *246 he commenced with his plan for the construction of a large, luxurious canal barge, capable of cruising through the over 60,000 miles of navigable rivers and canals in Europe. The boat was designed so that petitioner could use it as his residence and also charter it to persons wanting to cruise the Western European inland waterways. Petitioner did most of the designing of the boat himself and personally supervised construction. The boat was completed in 1960 and christened the Alcuin. To assure that the Alcuin would be able to navigate virtually all the canals of Western Europe, petitioner took the utmost care to gather information about canal sizes and regulations. However, he did not undertake any comparable analysis to project whether the chartering of the boat would be a profitable business venture, and he had no prior experience with such an operation. At trial he could recall having sought business advice before the Alcuin was built from only two persons, both employees of the American Express Company, who did no more than discuss with him the general concept of whether an all-inclusive charter boat tour would appeal to American tourists. However, in 1960 when the Alcuin *247 was built, there were no operations in Western Europe offering canal boats for the type of charter contemplated by petitioner, that is, a luxury cruise, with all meals, beverages and other services included in a basic fee, although many operations offered boats for charter on a self-drive basis or with only a few services provided. The Alcuin is 75 feet in length and has two decks. The lower deck has six bedrooms, four bathrooms, crew's quarters and an engine room. The main deck has a galley, dining salon, sitting room, sun deck and bridge. The vessel is equipped with full living facilities, including such amenities as a refrigeratorfreezer, electric washing machine and dryer, stereo record player and color television set. Not only were charter passengers allowed full use of all facilities on the boat but they were also provided with all meals, wine and liquor included in a set price. A private car, with one of the crew serving as chauffeur, accompanied the boat on charter trips, so that passengers could take touring and shopping trips to places near the canals. The Alcuin has served as petitioner's primary residence since it was constructed, with petitioner living in one of *248 the double-berth cabins. The crew of the Alcuin also lived aboard the vessel, at least during the charter season. In addition to furnishing living quarters for the captain and crew, petitioner furnished them food and paid salaries and related taxes on an annual basis. From the commencement of operation in 1960 through approximately 1970, the Alcuin's crew consisted of a captain, chef, and four or five stewards. On charters during this period, petitioner served as charter director only. After his chef left in 1970, petitioner assumed the cooking responsibilities himself on the charters. During 1971 the crew size was also reduced by retaining only two stewards on a full-time, annual basis. The other stewards were replaced by casual labor hired only while the boat was chartered. Thus, from 1971 through 1975, the full-time crew of the Alcuin consisted of a captain, two stewards and petitioner, functioning on charters as chef and charter director. As charter director, petitioner planned the daily itinerary of the cruise, arranged sightseeing tours and excursions, and handled correspondence, accounting and other records. As chef, petitioner purchased food daily, drew up menus, and prepared *249 all the meals on the boat. He cooked not only for the passengers but also for the entire crew. However, he was assisted in cooking by other crew members, particularly in the more mundane tasks. During the entire period from 1960 through 1975, petitioner undertook only sporadic and minimal advertising of the boat charter operation, primarily in magazines aimed at American travelers, such as Yachting, The New Yorker, and the International Herald Tribune. Petitioner felt that advertising was not worth the expense; he obtained bookings primarily from word-of-mouth referrals and repeat travelers during the years in issue. Additionally, he made no direct effort to obtain charter participants from American travel agents, although he did use a Paris travel agency to provide some services to charter participants and this agency had some contact with American travel agents. The charter boat season in Western Europe is approximately 24 weeks--from early May through the end of October. However, it was not possible for petitioner to utilize this entire season for charter purposes because, as he testified, he generally needed 10 days' time between charter trips to provision and prepare the *250 boat for the next charter. Prospective bookings in 1970 were 15 weeks; in 1971, 10 weeks; in 1972, 20 weeks; in 1973, 18 weeks; in 1974, 18 weeks; and in 1975, eight weeks. However, because of significant cancellations in most of these years, the Alcuin was never chartered for more than 14 weeks in a season. In 1971, the Alcuin was actually chartered for 10 weeks; in 1972, 13 weeks; in 1973, 11 weeks; in 1974, 14 weeks; and in 1975, five weeks. The evidence is somewhat conflicting as to what amount was charged to persons chartering the Alcuin in the years in issue. Based primarily on petitioner's own testimony, we find the charge per week for a group of up to seven persons was $3,000 in 1970, 1971 and 1972; $3,500 in 1973; $4,000 in 1974; and $5,000 in 1975. If there were in excess of seven passengers, $50 per day per additional passenger was added to the basic charter fee. The maximum capacity of the Alcuin was nine passengers, although there is no evidence that it often carried this many. Since the end of the 1975 season, petitioner has not offered the boat for charter but has been trying to sell it for $150,000 net of sales cost, which would merely allow him to recoup his *251 initial $150,000 acquisition cost of the boat. Petitioner had substantial net operating losses from the operation of the Alcuin in every year since the boat was constructed. The following table shows gross receipts, expenses and net operating losses for the years 1962 through 1978: Net Operating
Year
Gross receipts
Expenses
Loss
1962
$25,134.12
1963
21,374.48
1964
31,085.60
1965
36,065.05
1966
$35,163.50
$59,415.60
24,252.10
1967
31,291.00
59,021.80
27,730.80
1968
33,887.00
70,276.95
36,389.95
1969
39,789.00
70,114.00
30,325.00
1970
25,752.50
82,646.61
56,894.11
1971
30,311.00
77,745.45
47,434.45
1972
32,720.00
94,510.92
61,790.92
1973
37,001.00
108,007.68
71,006.68
1974
54,675.00
117,992.00
63,317.00
1975
20,660.00
70,318.00
49,658.00
1976
44,678.00
44,678.00
1977
27,925.00
27,925.00
1978
20,036.00
20,036.00
It has been stipulated that petitioner maintained complete and accurate records with respect to the operation of the Alcuin. Respondent also does not contest that petitioner did not deduct as business expenses the cost of food he consumed while on the charter trips. [2] *252 Since the construction of the Alcuin, petitioner has had no employment other than his work in chartering the boat. His continual losses from the charter boat operation have not meant, however, that he has received no income in these years. His losses from the boat operation were used to offset, completely or in large part, trust and dividend income received in these years. During the years 1966 through 1978, petitioner received trust and dividend income in the following amounts: Trust and
Year
Dividend Income
1966
$47,286.11
1967
49,791.04
1968
49,842.00
1969
54,451.00
1970
56,897.53
1971
57,696.80
1972
58,151.88
1973
56,853.74
1974
60,807.00
1975
106,634.00
1976
78,304.53
1977
106,790.00
1978
119,925.00 For each of the taxable years in issue, petitioner filed a Federal individual income tax return. However, the returns for the years 1970 through 1976 were not filed timely. The following table lists the due dates and the dates the returns were filed: Taxable
Date Return
Year
Due Date
Filed
1970
6/15/71
10/ 1/72
1971
6/15/72
5/30/74
1972
6/15/73
5/ 3/74
1973
6/15/74
9/29/75
1974
4/15/75
3/22/78
1975
4/15/76
3/22/78
1976
4/15/77
3/22/78
On *253 audit, respondent disallowed the net operating losses attributable to the operation of the Alcuin, which petitioner had deducted on his returns in the years at issue. The reason for disallowing these claimed deductions was respondent's determination that the operation of the boat was not an activity engaged in for profit. ULTIMATE FINDING OF FACT Petitioner's operation of the Alcuin was not an activity engaged in for profit during the years in issue. OPINION The question to be considered is whether petitioner had an actual and honest profit objective in owning the canal boat, Alcuin, and making it available for charters during the years in issue, so that he may deduct all the expenses and depreciation incurred in owning and operating the boat. Initially, we note that this case is dissimilar from many of the other cases relating to the existence of a profit motive because the type of activity undertaken by petitioner here would not normally be characterized as a hobby. Certainly, a charter boat operation, if carried on in a businesslike fashion, is the type of activity that may constitute a trade or business for which deductions are allowed under section 162. [3] *255 Here, the activity *254 had many of the characteristics of a true business. Petitioner kept adequate books and records and ran the charter trips in a professional but accommodating manner, which evidently impressed enough of his passengers so that many returned for subsequent trips or recommended the Alcuin to others. Furthermore, petitioner unquestionably worked hard on the charter trips, particularly after he assumed the duties of chef. There is simply nothing to support respondent's contention that, because he apparently enjoyed his work as chef, petitioner's activities during the charters were predominately pleasure rather than work. A taxpayer's enjoyment of the type of job commonly performed for pay cannot automatically transform it into a hobby. Jackson v. Commissioner,59 T.C. 312, 317 (1972). However, the existence of characteristics of a business such as those discussed above does not conclusively establish whether petitioner had an objective to derive a profit from the activity. Carter v. Commissioner,645 F.2d 784, 786 (9th Cir. 1981), affg. a Memorandum Opinion of this Court; Bolt v. Commissioner,50 T.C. 1007, 1013 (1968). The test to be applied is whether the taxpayer was engaged in the activity with the predominate purpose and objective of making a profit. Allen v. Commissioner,72 T.C. 28 (1979); accord, Golanty v. Commissioner,72 T.C. 411 (1979), affd. per order 647 F.2d 170 (9th Cir. 1981); Engdahl v. Commissioner,72 T.C. 659 (1979). The taxpayer's expectation of profit need not be a reasonable one, but the taxpayer must enter into, or continue, the activity with the objective of making a profit. Dreicer v. Commissioner,78 T.C. 642, 645 (1982), on appeal (D.C. Cir. June 1, 1982), Golanty v. Commissioner,supra at 425-426; Churchman v. Commissioner,68 T.C. 696 (1977); section 1.183-2(a), Income Tax Regs.
Here, petitioner had the burden of showing an objective to make a profit from his ownership and operation of the Alcuin during the years 1970 through 1978. Boyer v. Commissioner,69 T.C. 521, 537 (1977); Benz v. Commissioner,63 T.C. 375 (1974); Rule 142(a), Tax Court Rules of Practice and Procedure. Yet, he introduced no evidence that he ever projected receipts and expenses. [4] By 1970, the first *256 of the years in issue, petitioner had suffered net operating losses for 10 consecutive years, a fact that should have spurred any entrepreneur either to take drastic action to revamp his operation so that the possibility of such recurring losses would be reduced or to abandon the enterprise altogether. See Wittstruck v. Commissioner,T.C. Memo. 1980-62, affd. per curiam 645 F.2d 618 (8th Cir. 1981). [5] In view of the operation's history of consistently large net operating losses, we must assume that petitioner recognized in 1970 that the operation had severe problems. We note, too, that petitioner had seven years' business experience with the Hyster Company organizing its Dutch subsidiary, which should have made him well aware of the need to evaluate his progress toward reducing the potential losses. Petitioner points to the fact that he significantly reduced crew size in 1971. This probably did reduce his overall expenses in 1971 but it was insignificant in relation to the 1971 net operating loss of over $47,000. The trend toward larger annual net operating losses commenced again in *257 1972. Furthermore, after 1971 petitioner evidently made no substantial operational changes, even though his expenses and net operating losses rose dramatically over the next few years. [6] When we look at the possible gross receipts petitioner could have anticipated receiving in any of the years in issue and compare these to expenses that he must have anticipated, it is obvious that there was never any possibility the operation could come anywhere close to making a profit. The record shows that the charter season was approximately 24 weeks, charters during the years in issue averaged two weeks in duration, and a minimum of one week was necessary for preparations between charters. Thus, the best that petitioner could have hoped for was that the boat would be chartered for 17 weeks per year. In 1970, he charged $3,000 per week for a party of seven, which would *258 have produced gross receipts of $51,000 had he succeeded in securing charters for all possible weeks. This amount would have been far less than what would have been needed to defray even the prior year's expenses of $70,114. Moreover, petitioner should have expected expenses to rise because of inflation and his failure to institute any substantial cost saving measures. Even if we assume that petitioner could have secured nine passengers for all these charters, his gross receipts would have been increased by only $11,900, leaving gross receipts still over $7,000 below expenses. Listed below are similar computations for the other years in issue during which charters were offered. They are also based on the assumptions, highly favorable to petitioner, that the Alcuin would be chartered for 17 weeks per year, that there would be nine passengers on each cruise, and that expenses would equal those of the prior year. Projected Gross
Projected
Projected Net
Year
Receipts
Expenses
Operating Loss
1971
$62,900
[7] *259 $64,647
$1,747
1972
62,900
77,745
14,845
1973
71,400
94,511
23,111
1974
79,900
108,008
28,108
1975
96,900
117,992
21,092
These objective computations, based on assumptions that would have been used only by an incorrigible optimist, are overwhelming evidence of the absence of a profit motive, and we believe they should be accorded far more weight than petitioner's own statements that his motivation was "to make a living" and that it was his opinion that he was operating a business. [8] *261 See Dreicer v. Commissioner,supra;Churchman v. Commissioner,supra at 701. Our determination that it was objectively impossible *260 to anticipate making a profit is in accord with what really occurred in this situation. We note that petitioner had a long history of unexplained losses in his operation of the Alcuin, a factor generally seen as persuasive evidence of the absence of profit motivation. Golanty v. Commissioner,supra at 427; Allen v. Commissioner,supra at 34. Nor can we overlook the fact that petitioner used the Alcuin as his personal residence for the entire year, not just when it was chartered. We note, too, that petitioner had an independent source of substantial income during the years in issue and that the deductions claimed with respect to the Alcuin were used to offset his income, a factor consistent with a finding that profit motive was lacking. See Golanty v. Commissioner,supra at 428-429. The early years, 1960 through 1969, are not before the Court and we make no determination as to petitioner's original intent. It is important, however, to realize that this early period was more than sufficient as a "start-up" period, [9] even under the circumstance that petitioner was in fact the initiator of a new type of business activity. The issue here is whether petitioner has shown that he continued his charter operation after 1969 with the requisite profit motive, in view of the 10-year history of losses. By 1970, petitioner knew that his then operational methods could not produce a profit. He must also have known that the rather minor reductions in cost achieved in 1970 and 1971 could not, even under the most favorable assumptions, convert the annual loss into a profit. Continuation of an activity under these circumstances creates at least a clear inference that profits were irrelevant, hence that no profit motive existed. [10] Petitioner has done nothing to rebut this inference. On this record *262 we must conclude that petitioner has failed to establish that his ownership and operation of the Alcuin was a profit-oriented trade or business for which expenses and depreciation may be deducted under sections 162 and 167. Therefore, we agree with respondent that only those deductions that are allowed by other I.R.C. provisions, including section 183, [11] *263 may be taken in the years in issue. Having disposed of the primary issue as to the existence of a profit motive, we turn now to an examination of whether respondent was justified in determining additions to the tax under section 6651(a). Petitioner claims that his failure to timely file his returns was due to his inability to get access at any one time to all his books and records, which were stored with various friends and acquaintances in Nijmegen and Paris. However, petitioner himself testified that he "simply didn't have the time" to file his returns, a totally meritless argument, particularly in view of the fact that he had no job other than his work on the Alcuin during the charter season. That his records may have been stored in different places, a situation entirely of his own making, provides him with no excuse for his failure to timely file his returns.Therefore, we find that petitioner is liable for all the additions to the tax set forth in the notices of deficiency with respect to the years 1970 through 1976. Decisions will *264 be entered for the respondent.
Footnotes
*. This case was tried before Judge Cynthia H. Hall, who has resigned from the Court. By order of the Chief Judge, the case was reassigned to Judge Meade Whitaker↩ for disposition.
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.↩
2. We assume that petitioner did not deduct his direct personal expenses, such as food, during the remainder of the year when the boat was not on charter. The record does not reflect the extent to which operation and maintenance expenses of the boat incurred in periods outside the charter season were deducted.
3. Compare Jackson v. Commissioner,59 T.C. 312 (1972), and McLarney v. Commissioner,T.C. Memo. 1982-461; with Martin v. Commissioner,50 T.C. 341 (1968), and Rand v. Commissioner,34 T.C. 1146↩ (1960).
4. Compare McLarney v. Commissioner,supra.↩
5. See also Worley v. Commissioner,T.C. Memo. 1981-51↩.
6. Petitioner tried to characterize the losses in the years in issue as not anticipated but due to unforeseen fluctuations in currency exchange rates and political attitudes. In view of the track record of losses throughout the 1960's and our objective computations set forth below, we find this argument to be devoid of merit.↩
7. Because, as we have previously discussed, petitioner reduced his crew size in 1971, we have allowed a reduction of $18,000 in anticipated expenses. The $18,000 figure was arrived at by taking expenses on the Schedule C for 1970 for crew salaries, taxes, food and other expenses, and by multiplying such crew expenses by three-sevenths, to reflect the reduction in the size of the crew from its maximum of seven persons on an annual basis to three on an annual basis and two hired during the charter season only. Because the Schedule C and other evidence in the record did not allocate food, liquor, wine and similar expenses between the crew, petitioner, and passengers, we reduced the overall food, liquor, etc. expenses of $15,659.40 by approximately $5,000 for purposes of this corporation.
8. Petitioner's statement that he was motivated by a desire "to make a living" related to his motive in 1960 for having the Alcuin built and starting a charter operation. When he expressed his opinion that he was operating a business when he ran the Alcuin, he was not referring to any particular year. Thus, the slight weight to be given to these statements is even further reduced by the fact that they do not necessarily refer to the years in issue.
9. See Worley v. Commissioner,supra.↩
10. See Wittstruck v. Commissioner,T.C. Memo. 1980-62, affd. per curiam, 645 F.2d 618↩ (8th Cir. 1981).
11. SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule.--In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).