DOUGLAS C. HEPPE and JAN M. HEPPE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Heppe v. Commissioner
Docket No. 5595-93
United States Tax Court
T.C. Memo 1995-314; 1995 Tax Ct. Memo LEXIS 316; 70 T.C.M. (CCH) 63; July 18, 1995, Filed *316 Decision will be entered under Rule 155. For petitioners: David Lyle Segal. For respondent: Douglas A. Fendrick. PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent has determined deficiencies in petitioners' Federal income tax as follows: Year
Deficiency
1987
$ 9,619
1988
7,102
1989
7,484
1990 *  1991
1,998
* Although the petition for 1990 was dismissed for
filing out of time, petitioners' gain from the sale of
business property reported in 1991 will be affected by
the disallowance of depreciation included in the
deficiency assessed for 1990. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, [1] the issue remaining for decision is whether petitioners' sailboat-chartering activity was "engaged in for profit" within the meaning of section 183. *317 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners, Douglas C. Heppe (petitioner) and his wife Jan M. Heppe (Mrs. Heppe), resided in Allentown, New Jersey, at the time they filed the petition in this case. Since the early 1980's, Mrs. Heppe has worked for various retail department stores. She is currently the general manager for the John Wanamaker flagship store in Philadelphia, Pennsylvania. Since at least 1980, petitioner has been employed as a real estate development executive by Calton Homes, Inc. Some of his responsibilities include identifying and negotiating the purchase of unimproved real estate, planning and overseeing its development, and selling the improved property. During the years at issue, petitioners reported combined wage and salary income ranging from a low of $ 165,025 in 1991 to a high of $ 572,350 in 1987. At the time petitioners met in 1980, Mrs. Heppe was an avid sailor and had just purchased a 23-foot Paceship, which is a small cabin cruiser, at the Philadelphia Boat Show. Petitioner and Mrs. Heppe were married in the *318 spring of 1980, and soon thereafter, they took delivery of the Paceship. The Paceship was docked at Somers Point, 4 or 5 miles from Ocean City, New Jersey. Prior to meeting Mrs. Heppe in 1980, petitioner had never participated in sailboating. Petitioner, however, was familiar with handling boats. He began power boating in the late 1960's in Ocean City, New Jersey. When petitioner met the soon-to-be Mrs. Heppe, he was fascinated by her purchase of a sailboat as a single woman and, after years of power boating, did not understand "the intrigue of going five miles an hour". As petitioner became involved in sailboating, he attended basic and advanced navigation courses as well as a Coast Guard auxiliary course. Once married, both petitioners became active sailboaters and began attending various boat shows. During this time, the Paceship was used strictly for personal purposes and was never chartered. In 1981, petitioners traded in the Paceship and purchased a 30-foot Lippincott sailboat/cabin cruiser, the Bliss, at the Philadelphia Boat Show. They moved the Bliss to Ocean City, New Jersey, where petitioner also maintained a power boat. From 1981 through the sale of the Bliss *319 in October of 1986, the Bliss was used strictly for personal purposes and was never chartered. In 1984, petitioners moved the Bliss to the Chesapeake Bay area. They had lost some use of the boat in Ocean City due to inclement weather. They found that the waters in the Chesapeake Bay area are calmer, which allows for better cruising grounds. As petitioners were sailing in the Chesapeake Bay area and visiting various ports in the area, they began to consider entering the sailboat-chartering business. [2] They attended a symposium at the University of Delaware and four or five other seminars that created an interest in chartering and in the lifestyle associated with sailboats. Petitioners observed that the marinas along the shores of the Chesapeake Bay are attractive to travelers from Maryland, Virginia, and New Jersey because the weather is mild and the sailing conditions are more favorable than those along the New Jersey coast or the Virginia coast. *320 All of the marinas that petitioners visited in the area had sailboat-chartering businesses in association with their sailboat-sales businesses. Petitioners also talked with friends and relatives who were chartering sailboats in Annapolis, Maryland, and in northern Virginia. Petitioners found that the Chesapeake Bay area offered the best opportunities for weekend charters and short vacation trips. To petitioners, chartering sailboats seemed to be a thriving business. Thus, petitioners decided to enter the sailboat-chartering business. [3] They attended the 1985 Philadelphia Boat Show to explore their options. Usually, 15 to 20 individuals or organizations advertised chartering services at these boat shows. One of the companies with which petitioners were familiar was Gratitude Boat Sales, Inc. (Gratitude). Gratitude had a large space at the boat show, with at least three boats on display. Petitioners recognized the company from advertisements in various magazines and, as active boaters, had a feeling for Gratitude's reputation and the level of boating activity in which the company was involved. Gratitude was located on the Chesapeake Bay at the Gratitude Marina in Rock Hall, Maryland. *321 It offered bare-boat charters on a daily, weekend, and weekly basis. [4]
Having considered their options, petitioners decided to purchase a sailboat from Gratitude. On February 24, 1985, petitioners entered into a purchase agreement with Gratitude for the purchase of a 1985, 38-foot Westwind sailboat and accessories for the negotiated price of $ 92,675 (net of sales taxes). [5] The proposed settlement date for the delivery of the sailboat was *322 April 6, 1985. Petitioners named the sailboat the Earthshine. At the time of the purchase of the Earthshine, petitioners discussed the sailboat-chartering business with Gratitude representatives. Petitioners learned that the peak season for chartering sailboats on the Chesapeake Bay is from April 30 to November 1. [6] They questioned Gratitude representatives about various aspects of the company's business: the customer base, the turnover rate, and the optimal size of boat to put into service. Most of Gratitude's boats were in the 31-foot range. Gratitude represented to petitioners that it had an active group of sailors who eventually would want to trade up to larger boats such as the Earthshine. Since petitioners were purchasing the 38-foot Westwind, one of Gratitude's larger and *323 faster boats, petitioners thought they were placing themselves in good position for current charters and future resale. The expected high resale value of the Earthshine played a part in the decision to purchase the Earthshine. In petitioner's experience, he had observed power boats declining in value while sailboats were increasing in value. At that time, sailboat sales had been increasing for 4 or 5 years. This increase was due to the fact that boaters' interest in sailing was growing while production of sailboats had not been keeping pace and the costs of production had been rising. Petitioner thought *324 the value of the boat would not decline. Petitioners did not prepare a written financial analysis or schedule profit-making prospectives for the sailboat-chartering activity. They relied upon Gratitude's financial analyses when making the decision to purchase the Earthshine and to enter the sailboat-chartering business. Petitioner and a Gratitude representative discussed the expenses involved in the sailboat-chartering business and the cash flows that could be expected. Petitioner hoped to earn $ 8,000 minimum gross income per season, which required about 8 to 10 weeks of charters. [7] *325 Petitioner anticipated that, in 3 to 4 years, he would be receiving positive cash flow. [8] Petitioner, being familiar with the real estate rental business, considered additional factors (energy costs, etc.) in evaluating Gratitude's presentation and determined that it was an attractive venture. Petitioners viewed the purchase of the Earthshine and the entry into the charter-boat business as a complete arrangement with Gratitude. Petitioners engaged Gratitude to employ the Earthshine in the business of bare-boat charters. Petitioners entered into chartering agreements with Gratitude for the 1985, 1986, 1987, 1988, and 1989 Chesapeake Bay seasons. Under the agreements, Gratitude offered the *326 Earthshine for charter at a rate of $ 1,000 per week, less special promotional discounts. Gratitude agreed to maintain the Earthshine and perform repairs, upon approval from petitioners, at its normal hourly rate. Under the agreements, petitioners agreed to pay Gratitude a commission equal to 40 percent of the gross chartering proceeds. During 1985, Gratitude provided chartering services for approximately 20 boats of 38 feet or larger. Gratitude succeeded in securing charters for the Earthshine during the sailing seasons of 1985, 1986, 1987, and 1989. The Earthshine was chartered during 1985 for 22 days for gross charter income in the amount of $ 3,940, during 1986 for 22 days for gross charter income in the amount of $ 3,351, during 1987 for 9 days for gross charter income in the amount of $ 2,000, and during 1989 for 6 days for gross charter income in the amount of $ 1,239. [9] *327 There were no charter customers for the Earthshine in 1988. During all of the years from 1985 through 1989, all of the chartering activities for the Earthshine were arranged by Gratitude. [10]
From April of 1985 through November of 1989, the Earthshine was kept at the Gratitude Marina. During the time petitioners owned the Earthshine, it did not physically participate in any regattas, boat shows, or demonstrations. Although petitioners were pleased with the results of the first year of chartering since the boat was new to the service, 1986 and 1987 showed declines in income. In April of 1988, in an effort *328 to generate some charters, petitioner placed his own advertisement in Sail Magazine to supplement Gratitude's efforts because he was concerned that Gratitude representatives may have been steering potential customers to other boats. Petitioner, however, did not receive any responses to his ad. Petitioners did not receive any gross income from their sailboat-chartering activity in 1988. For personal and professional reasons, petitioners themselves did not travel to the Chesapeake Bay to oversee their sailboat-chartering activity. They maintained contact with Gratitude representatives during this period in which the Earthshine was placed with Gratitude for charter and in which their personal sailboat, the Bliss, was placed for sale with Gratitude. The Bliss was sold in October of 1986. In 1988 and 1989, petitioners decided that their charter-sailboat business was not performing to expectations. Petitioners doubted the effectiveness of Gratitude's marketing efforts and were still unhappy with the circumstances surrounding Gratitude's sale of the Bliss. They began soliciting other marinas in Annapolis, Maryland, about the possibilities of selling the Earthshine or *329 of moving the Earthshine to a new location for charters. However, by the time petitioners perceived these problems, there was a glut of sailboats in Annapolis. In November or December of 1989, Gratitude's marina operations were moved to Spring Cove Marina in Port Annapolis, Maryland. Petitioners did not follow Gratitude and did not enter into charter agreements with Gratitude for the 1990 or 1991 seasons. By this time, petitioners realized that the Chesapeake Bay remained the best area for the sailboat-chartering business but that the whole industry was experiencing a downward turn. Petitioners talked to friends and business associates about chartering the boat. See supra note 10. However, all of the charter activity for the Earthshine was arranged by Gratitude, and petitioners never succeeded in arranging any charter of their boat. After these efforts, petitioners decided to abandon the sailboat-chartering business, and in early November of 1989, petitioners decided to sell the Earthshine. After making this decision, petitioners took the Earthshine out of the water and moved it to Contemporary Yacht's in Port Annapolis, Maryland. Petitioners made this move *330 because they thought they had a better chance of selling the Earthshine at this new location. After several conversations with a representative of the Yacht Brokerage Central Agency, petitioners entered into an agreement on November 11, 1989, giving the Agency the exclusive right to sell the Earthshine. This agreement shows an asking price of $ 109,500, and petitioners hoped to sell the boat in the mid to high-90s. [11]
On December 18, 1989, petitioner borrowed $ 70,000 from Equitable Bank for his daughter's college education. The term of the installment *331 loan was 20 years, at an interest rate of 10.75 percent. The Earthshine was pledged as collateral for the loan. From November of 1989 until the sale of the Earthshine in January of 1991, petitioners did not put the sailboat back in the water. During the years they owned the Earthshine, petitioners used the Earthshine for two or three weekend trips and one or two week-long trips, for a total of 4 to 10 days a year. They understood there to be a 14-day personal-use restriction for tax purposes. Petitioners did not maintain a captain's log to record their personal usage of the Earthshine. Petitioners also did not maintain any formal books, records, and/or journals to record income and expenses associated with the operation of the Earthshine. [12] Petitioners did not maintain any separate bank accounts for the proceeds and expenses related to the operation of the sailboat. During the years at issue, petitioners devoted less than 2 hours a week to their sailboat-chartering activity. *332 Petitioners insured the Earthshine through the Windsor-Mount Joy Insurance Company. Petitioners purchased endorsements to the insurance policy that covered bare-boat charters. Petitioners maintained insurance on the Earthshine until February of 1990 when they reduced the policy coverage to "at port risk" since they had removed the sailboat from the water in November of 1989 and did not intend to put it back into the water. On their tax returns for the taxable years 1985 through 1990, petitioners reported the income and expenses of the sailboat-chartering activity on Schedules C as follows: [13]
1985
1986
1987
Income
$ 3,940  $ 3,083  $ 2,000  Depreciation
15,036 18,065 18,971 Commissions
1,576 1,235 800 Insurance
805 805 842 Other mtg.int.
5,978 10,494 3,865 Legal service
-0-  -0-  -0-  Rental expense
2,055 800 2,350 Repairs & Maint.
1,089 -0-  1,343 Taxes
-0-  -0-  -0-  Advertising
-0-  -0-  -0-  Dues & pub.
-0-  -0-  26 Car & truck exp.
210 315 -0-  Office
390 50 -0-  Supplies
-0-  1,293 -0-  T & E
226 -0-  -0-  Other
5 12 -0-  Total Exp.
$ 27,370 $ 33,069 $ 28,197 Losses
($ 23,430)
($ 29,986)
($ 26,197)
*333 1988
1989
1990
Income
-0-  $ 3,257  $ -0-    Depreciation
19,141 19,025 5,306 Commissions
-0-  1,302 -0-  Insurance
842 842 501 Other mtg.int.
-0-  -0-  6,644 Legal service
-0-  -0-  115 Rental expense
1,000 1,632 1,920 Repairs & Maint.
63 2,572 4,225 Taxes
12 -0-  -0-  Advertising
35 -0-  -0-  Dues & pub.
-0-  -0-  -0-  Car & truck exp.
-0-  -0-  -0-  Office
-0-  -0-  -0-  Supplies
-0-  -0-  -0-  T & E
-0-  -0-  -0-  Other
-0-  417 -0-  Total Exp.
$ 21,093 $ 25,790 $ 18,711 Losses
($ 21,093)
($ 22,533)
($ 18,711)
*334 On January 2, 1991, petitioners sold the Earthshine for $ 72,500. They reported a gain in the amount of $ 63,056 on their 1991 tax return. [14]
In the notices of deficiency issued for the years at issue, respondent determined that the deductions claimed by petitioners were not allowable because the sailboat-chartering activity was not an activity "engaged in for profit" within the meaning of section 183. In 1987 and 1989, respondent allowed expenses to the extent of gross income reported on Schedule C; in other words respondent disallowed the net losses of $ 26,197, $ 21,093, and $ 22,533 claimed for the years 1987, 1988, and 1989, respectively. For 1990, which is no longer before the Court, respondent disallowed claimed expenses, and hence disallowed the net loss of $ 18,711, because the chartering activity had been *335 abandoned and was not an active business that year. The deficiency notice indicated that some expenses may be deductible in 1991 when petitioners sold the Earthshine. See also supra note 14. However, there is no evidence in the record to substantiate any such deductible expenses. OPINION The issue to be decided is whether petitioners' sailboat-chartering activity was an activity engaged in for profit within the meaning of section 183. This is a factual inquiry requiring a weighing of the evidence in the record. Respondent asserts that petitioners' sailboat-chartering activity was not engaged in with the objective of making a profit and that section 183(a) applies. Thus, no deductions attributable to this activity are allowed, except as provided in section 183(b). Petitioners contend that they did enter into and carry on the sailboat-chartering activity with the requisite profit objective and that, as a result, the deductions are allowed under section 162(a) as the ordinary and necessary expenses of conducting a trade or business. Section 183(a) provides generally that, if an activity is not engaged in for profit, no deduction attributable to such activity shall be allowed *336 except as provided in that section. Section 183(b)(1) provides that deductions that are allowable without regard to whether the activity is engaged in for profit shall be allowed, and section 183(b)(2) provides that deductions that would be allowable only if the activity were engaged in for profit shall be allowed, "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of" section 183(b)(1). Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212". [15] For a deduction to be allowed under section 162 or section 212(1) or (2), petitioners must establish that they engaged in the activity with an actual and honest objective of making an economic profit independent of tax savings. Antonides v. Commissioner, 91 T.C. 686, 693-694 (1988), affd. 893 F.2d 656 (4th Cir. 1990); Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). *337 Their expectation of profit need not have been reasonable; however, they must have entered into the activity, or continued it, with the objective of making a profit. Hulter v. Commissioner, 91 T.C. 371, 393 (1988); sec. 1.183-2(a), Income Tax Regs.
The burden is on petitioners to show error in respondent's determination that the sailboat-chartering activity was not engaged in for profit. Rule 142(a); Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); *338 Boyer v. Commissioner, 69 T.C. 521, 537 (1977); Benz v. Commissioner, 63 T.C. 375 (1974). Whether the requisite profit objective exists is determined by looking to all the surrounding facts and circumstances. Keanini v. Commissioner, 94 T.C. 41, 46 (1990); sec. 1.183-2(b), Income Tax Regs. Greater weight is given to objective facts than to a taxpayer's mere statement of his intent. Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); Beck v. Commissioner, 85 T.C. 557, 570 (1985); sec. 1.183-2(a), Income Tax Regs.
Section 1.183-2(b), Income Tax Regs., provides a list of factors to be considered in the evaluation of a taxpayer's profit objective: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar *339 activities; (6) the taxpayer's history of income or losses from the activity; (7) the amount of occasional profits, if any, from the activity; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. This list is nonexclusive, and no single factor or even a majority of factors necessarily controls. Abramson v. Commissioner, 86 T.C. 360, 371 (1986); sec. 1.183-2(b), Income Tax Regs.
After weighing all of the objective factors coupled with petitioner's statements of intent, we conclude that petitioners were not engaged in the sailboat-chartering activity for profit. A number of factors indicate that petitioners did not have the requisite profit objective. Petitioners did not enter into and oversee their sailboat-chartering activity in a businesslike manner. They did not formulate any business plan or make any substantive financial projections before starting this activity. Although petitioners had considerable recreational boating experience and are professionals experienced in marketing and sales matters, they had no expertise in the business of sailboat chartering. Considering this lack of expertise, the amount *340 of research performed by petitioners into the specific business of sailboat chartering was minimal. Petitioners essentially relied upon the analysis and advice of Gratitude representatives who were also the individuals selling them the sailboat. Both petitioners were, or should have been, aware of the need to develop and follow a formal plan of operations. They did not approach this activity as they approached the other businesses in which they were involved. Although Gratitude did have some incentive to pursue charters for petitioners' boat and although the record shows that much of the lack of charters is attributable to the glut of sailboats and the general downturn of the market, petitioners did little to address their concerns about Gratitude's lack of effort on their behalf. They did not sign on with another authorized agent or undertake substantive marketing efforts of their own, beyond a magazine advertisement for 1 month in the early part of the 1988 season. They did nothing further although there were no charters at all for the 1988 season. Furthermore, despite their reservations about Gratitude, petitioners continued to rely upon Gratitude's bookkeeping and the periodic *341 statements showing the income received from charters and the expenses incurred. Petitioners did not maintain formal books and records or a separate bank account for this activity. Petitioners were financially secure and obviously did not have to rely on any income generated by the sailboat-chartering activity. Petitioners both worked full-time jobs unrelated to this activity: Petitioner was involved in a successful real estate development company during the years at issue, and Mrs. Heppe was advancing in the retail industry. Petitioners' sailboat-chartering activity did not generate any profits during the taxable years at issue, even disregarding depreciation and interest expenses. In fact, the substantial losses generated by their sailboat-chartering activity ($ 141,950) offset significant portions of petitioners' income from other sources. Thus, for practical purposes, the tax benefits generated by the activity virtually paid for the Earthshine. The cases in which we have found that a taxpayer's sailboat-chartering activity was a trade or business and was entered into for profit involved taxpayers who prepared to enter the business by gathering data and working out a formal *342 business plan, who solicited and obtained assistance from disinterested professionals to analyze their plan, and who actively marketed or oversaw the operation of the business in a businesslike manner. See Hellings v. Commissioner, T.C. Memo. 1994-24; Feldman v. Commissioner, T.C. Memo. 1988-126. Too many of these factors are missing from petitioners' case. Petitioners may have hoped eventually to generate some positive cash flow from their sailboat-chartering activity, but their operation of the activity did not rise to the level of a trade or business as required by sections 162, 212, and 183. However, petitioners are entitled to, and apparently have already been allowed, certain deductions under section 183(b), and the amount of gain reported on the sale of the Earthshine will have to be adjusted. See supra note 14. Based on the foregoing, Decision will be entered under Rule 155. Footnotes
1. For the taxable year 1991, petitioners claimed unreimbursed employee business expense deductions on line 19 of Schedule A in the amount of $ 9,747. Respondent disallowed this amount in the notice of deficiency for lack of substantiation. Respondent now has allowed $ 8,000 of this amount, and petitioners concede the remaining $ 1,747.↩
2. Petitioner testified that he and Mrs. Heppe intended to stay in the sailboat-chartering business for the rest of their lives. He testified they hoped to purchase a boat for charter, quickly repay the mortgage on it, start receiving positive cash flows from chartering activities, and enjoy visiting the Chesapeake Bay to check on the boat. Petitioner testified that they intended to charter that boat for 8 to 10 years and then trade up to a larger (42-foot to 44-foot) boat. Petitioner also testified that they then envisioned themselves operating a year-around sailboat-chartering business, perhaps in the Caribbean, and becoming the captain and cook as a vocation. Petitioner in 1985 was 38 years old and had children to educate, so any such future plans were rather long range and tentative in nature.↩
3. Our use of the term "business" is for ease of analysis while setting forth the facts of this case. We discuss below whether petitioners' activity actually constituted a trade or business for tax purposes.↩
4. Gratitude personnel would clean the boat before and after each use; they would put safety equipment on the boat; they would put ice on the boat and make sure that the fuel tank had been filled; and they would bring the boat from its slip to the charter dock, instruct the charterers, and send them on their way. Gratitude did not offer to provide captains for charters.↩
5. Petitioner testified that this boat was marketed as the boat show special and was attractively priced. Petitioner further negotiated the price, feeling confident that he could subsequently list the boat for sale at $ 125,000.↩
6. Specifically, the best time to sail on the Chesapeake Bay is April, May, part of June, and the first of September into November. Due to the hot weather, July and August are not preferred by many sailors, but occasionally, families vacationing in the area will charter a boat for a few days. The Earthshine↩ was capable of traveling six knots with the engine, so it could travel from port to port without wind. 7. At trial, petitioner testified that he had estimated that the costs of maintaining the sailboat while in bare-boat charter would be minimal, with a break-even point at approximately 8 to 10 weeks of charters per year. That would be about $ 8,000 to $ 10,000 gross income per year. He believed that this level of activity could be achieved with the assistance of Gratitude Boat Sales, Inc., or another qualified agent.↩
8. On Apr. 6, 1985, petitioners borrowed $ 80,000 from the Essex Credit Corp. for the purchase of the Earthshine. The term of the loan was 15 years, at an interest rate of 12.5 percent. Petitioners executed a Vessel Security Agreement in which they pledged the Earthshine as security for the loan. Petitioner's principal business of building houses was doing well during this time period and he was receiving generous bonuses. Petitioner planned to use those resources to pay the mortgage on his house and the loan on the Earthshine so as to reach the break-even point in the sailboat-chartering business more quickly. On June 23, 1987, petitioners paid off the loan on the Earthshine↩.
9. On their Schedule C for the taxable year 1989, petitioners claimed additional charter income in the amount of $ 2,018. Petitioners have not been able to determine the dates that the Earthshine was chartered or the name of the individuals who chartered the sailboat. The parties made an erroneous pen-and-ink change to stipulation paragraph 41 from $ 2,018 to $ 2,048, no doubt to make this figure consistent with another error in their stipulation as to the Schedule C gross income reported for 1989. See infra↩ note 13.
10. Petitioners stipulated that "During the years 1985 through 1991, the petitioners did not know any individuals who chartered their Sailboat. All solicitation was done by Gratitude. Petitioners did not sign up anyone to charter their Sailboat." At trial, petitioner testified that, during the downturn in business, petitioners talked to friends and business associates about chartering the boat. Upon further review of Gratitude's records, petitioners recognized one individual's name and wish to modify the stipulation accordingly. The stipulation will be modified only in that it will read "* * * petitioners knew only one of the individuals who chartered their Sailboat * * * ".↩
11. Petitioners based their asking price on information received from the manufacturer in Taiwan. Such information indicated that a new boat directly from Taiwan was selling for $ 142,500. Petitioners also knew of a similar boat that had sold on the Chesapeake Bay in the range of $ 112,000 to $ 119,000. Knowing that the market for sailboat resales was depressed, petitioner testified that he tried to establish a competitive asking price based on this information.↩
12. Petitioner testified that he did not keep a formal journal because there were not many transactions to track. Petitioner did keep a "sailboat file" in which he maintained the Earthshine's↩ insurance policy, the charter agreements, the slip rental agreement, and any correspondence received from Gratitude. Petitioners received four or five statements a year from Gratitude for those first 2 active years.
13. Respondent agrees that petitioners have substantiated the expenses claimed on the Schedules C for the taxable years 1987, 1988, and 1989. There are errors in the parties' stipulation paragraphs 22 and 23 as to certain of these income and expense amounts, but the Court has used the actual figures from the Schedules C. There is no dispute as to the net loss figures for 1987, 1988, and 1989.↩
14. Respondent agrees that, if this Court disallows petitioners' claimed depreciation deductions for the taxable years 1987, 1988, and 1989, petitioners' gain will have to be adjusted accordingly.↩
15. Under sec. 162, deductions are allowable for the expenses of carrying on an activity that constitutes a trade or business if those expenses are ordinary and necessary to the conduct of the trade or business. Sec. 212 allows the deduction of expenses incurred in connection with an activity engaged in for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.↩